THEODORE KOTTER, EDWARD JUNG, TRANSPORT OF NEW JERSEY, A NEW JERSEY CORPORATION AND LINCOLN TRANSIT CO., INC., A NEW JERSEY CORPORATION, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF EAST BRUNSWICK, THE MAYOR AND COUNCIL OF THE TOWNSHIP OF EAST BRUNSWICK AND SUBURBAN TRANSIT CORP., A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 7, 1978—Decided June 29, 1978.

Before Judges LORA, SEIDMAN and MILMED.

*Mr. David J. Goldberg* argued the cause for appellants (*Messrs. Warren, Goldberg & Berman,* attorneys; *Mr. Goldberg* on the brief).

*Mr. Bertram E. Busch* argued the cause for respondent Township of East Brunswick (*Messrs. Busch & Busch,* attorneys; *Mr. Bertram E. Busch* on the brief).

*Mr. Robert J. Cirafesi* argued the cause for respondent Suburban Transit Corp. (*Messrs. Wilentz, Goldman & Spitzer,* attorneys; *Mr. Cirafesi* on the brief).

PER CURIAM. This appeal involves the propriety of a November 18, 1975 agreement between defendants Township of East Brunswick (Township) and Suburban Transit Corp. (Suburban) for the operation by Suburban of a Park-Ride facility on Route 18 in East Brunswick and the furnishing by it of certain services in connection therewith.

The essential facts are not in dispute. Plaintiffs are two resident taxpayers of East Brunswick and two motor bus carriers. Defendant Suburban is also a motor bus carrier. On October 8, 1975 the township council of defendant township advertised for bids "for the furnishing of Commuter-Bus Service Park and Ride Facility to be located along Route 18 in East Brunswick, N. J." The specifications required the bidders to agree to certain specific conditions, *viz.*:

1. During the morning commuter hours buses must originate at the Park and Ride lot, and operate directly to New York City.
2. During the morning commuter period a dispatcher must be assigned to manage the service provided from the Park and Ride facility.
3. A ticket agent must be on duty at the Park and Ride lot each weekday from 6:00 a.m. to 8:00 p.m.
4. The bus service shall begin no later than 6:00 a.m. each weekday morning. During the peak commuter periods, a five minute head-

way shall be operated. Mid-day and evening service shall be provided both to and from New York with at leat [*sic*] one bus each hour. The last bus shall leave New York City at approximately 12 midnight.

5. Additional buses must be available on short notice to handle any passenger overloads.

6. The successful bidder will be responsible for cleaning and maintenance of the bus station.

The specifications were silent as to duration of the agreement as well as to other terms regarding operation, management and maintenance of the facility. The required proposal form called upon the bidders to state the "[m]onthly amount bid for the privilege of managing the terminal building and stated services."

Suburban was the only bidder. The township accepted the bid and awarded Suburban "the right to manage the proposed parking lot on Route 18 in accordance with the attached bid specifications for a fee of $200 per month payable in 12 equal installments at the beginning of the contract month." The November 18, 1975 agreement was prepared and executed. In it Suburban undertook to pay the stipulated sum to the township "for the privilege of managing and operating a Park-Ride facility, in accordance with bid specifications * * *." The agreement was conditioned on Suburban's ability to obtain and keep in force appropriate Interstate Commerce Commission authority to transport passengers, as a common carrier by motor vehicle over regular routes, between the Park-Ride facility and New York. The duration of the contract is stated in the following terms:

The term of this agreement shall be for a period of one year and shall be automatically renewed from year to year thereafter until either party shall notify the other in writing that it desires to terminate this agreement at the expiration of the then current term, which notice shall be given at least ninety (90) days before expiration of the then current term.

The premises on which the Park-Ride facility was located were leased to the township by its private owners, two corpo-

rations, for a one-year term, *i.e.*, from December 1, 1975 through November 30, 1976, with the following renewal option:

Tenant shall have the option to renew this lease for one (1) additional period of one (1) year upon the same terms and conditions herein set forth, except for the rent to be paid which shall be $75,000.00, payable in equal monthly installments of $6,250.00 each. Said option shall be exercised by Tenant giving notice in writing, to Landlord on or before September 1, 1976, provided however that this Lease shall not be deemed renewed unless Tenant shall, at the same time, submit to Landlord reasonable and convincing proof, satisfactory in all respects to Landlord, that the Tenant has progressed sufficiently with outside funding to enable it to purchase the premises herein demised during the renewal period.

Some 9½ months later, on September 3, 1976, plaintiffs filed their complaint in lieu of prerogative writs seeking, among other relief: (1) a declaration that the November 18, 1975 agreement was "an *ultra vires* act of the Township and void"; (2) a declaration that the agreement, "if otherwise valid, is for a term of not more than one year"; (3) a requirement that any extension or renewal of the agreement be by way of competitive bidding in accordance with all applicable statutes, and (4) a *pendente lite* and permanent restraint restraining defendants from interfering with or preventing plaintiffs Transport of New Jersey (Transport) and Lincoln Transit Co., Inc., (Lincoln) "from providing interstate bus services from and out of the East Brunswick Park-Ride facility."

The matter was tried on a stipulation of facts, affidavit, certification and exhibits marked in evidence. Plaintiffs moved for summary judgment and defendants moved to dismiss the complaint. After hearing, the trial judge, referring to the subject agreement as a "lease," denied equitable relief, held that "the 45 day rule [*R.* 4:69–6(a)] bars scrutiny of the specifications," and that "an estoppel against TNJ [Transport] and Lincoln" was created. He found the

"condition of the bidding overall [to be] fairly competitive," and the November 18, 1975 agreement to be

\* \* \* a valid contract for a renewal term not to exceed fifty years, subject to the renewal of the prime lease on behalf of the Township and subject to the Interstate Commerce Commission approval of its lines on behalf of Suburban Transit Corporation.

He thereupon ordered the entry of judgment for defendants. This appeal followed.

As framed in the brief submitted on behalf of plaintiffs, the following issues are raised on the appeal:

POINT I — The Trial Court Erred in Holding the November 18, 1975 Agreement to be a Lease Agreement Renewable Annually For a Period up to 50 Years.

POINT II — A Municipality is not Authorized to Contract for Transportation Services as Set Forth in the November 18, 1975 Agreement and Such an Agreement is *Ultra Vires.*

POINT III — The November 18, 1975 Agreement Which Was Subject to the Local Public Contracts Law was Entered into in Violation of the Provisions Thereof.

POINT IV — Plaintiffs are not Barred by Rule 4:69–6 or by the Doctrine of Estoppel or Laches from Contesting the Validity of the November 18, 1975 Agreement.

The November 18, 1975 instrument under attack is obviously not a lease. Under the specific terms of paragraph "1" of the agreement, all Suburban acquired from the township for payment of the stipulated fee of $200 a month was "the *privilege* of managing and operating a Park-Ride facility, in accordance with bid specifications commencing on November 18, 1975." (Emphasis supplied).

Unquestionably agreements respecting the use of land can be made by an owner which fall short of a leasehold. License, permit, privilege and limited custodial use are open to consensual arrangements. 3 *Powell, Real Property,* § 428, pp. 514–519 (1952); compare *Passaic & Hackensack Bridges v. State,* 22 N. J. L. 593 (E. & A. 1849). The difference between a lease and license or similar limited status, although difficult to distinguish at times, is that a lease gives exclusive possession of the premises against all the world, including the owner, while a license confers a privilege to occupy under the

owner. *Tips v. United States*, 70 *F.* 2d 525 (5 Cir. 1934) ; *Case v. Kadota Fig Ass'n of Producers*, 207 *P.* 2d 86, 95 (Cal. D. Ct. App. 1949), modified 35 *Cal.* 2d 596, 220 *P.* 2d 912 (Sup. Ct. 1950) ; *Strandholm v. Barbey*, 145 *Ore.* 427, 26 *P.* 2d 46 (Sup. Ct. 1933) ; 32 *Am. Jur.*, *Landlord & Tenant*, § 5; 51 *C. J. S. Landlord & Tenant* § 202e(2) ; *Powell, supra,* § 428. A license or similar status is generally revocable at the pleasure of the owner and gives occupancy so far as necessary to engage in the agreed acts or the performance of agreed services and no further; a lease gives the right of exclusive possession for all purposes not prohibited by its terms. 32 *Am. Jur., supra,* § 5. [*Thiokol Chem. Corp. v. Morris County Bd. of Tax.*, 41 *N. J.* 405, 416–417 (1964)]

Here, clearly, the occupancy of the premises which Suburban obtained was only that "necessary to engage in the agreed acts or the performance of agreed services and no further * * *."

 The Local Public Contracts Law, *N. J. S. A.* 40A:11–1 *et seq.,* was applicable to the subject contract. It was so intended by the municipal governing body[1] and required by the terms of the statute. See *N. J. S. A.* 40A:11–4; *Pied Piper Ice Cream v. Essex Cty. Park Comm'n,* 132 *N. J. Super.* 480 (App. Div. 1975) ; *Kurman v. Newark,* 124 *N. J. Super.* 89 (App Div.), certif. den. 63 *N. J.* 562 (1973). Nonetheless, the specifications for the contract were not "drafted in a manner to encourage free, open and competitive bidding," as required by *N. J. S. A.* 40A:11–13. Nowhere in the specifications or the notice to bidders is there any reference to the term of the agreement for which bids were being solicited. And no reference, as required by the statute, is made in the specifications to the automatic renewal provision[2] which the parties included in

[1]The October 20, 1975 resolution of the municipal council accepting Suburban's bid states, in its preamble, that the bids requested from bus companies serving the geographic area of East Brunswick "were advertised in the local newspaper according to N. J. S. A. 40A:11–1 et seq."

[2]In view of our disposition of this appeal, we find no need to pass upon the question of the validity of such a provision.

the November 18, 1975 agreement. *N. J. S. A.* 40A:11–13 (e). Specifications should be as definite, precise and full as possible so that there may be intelligent bidding. There must be a reasonable similarity between that which is solicited and the terms of the contract entered into. See *Skakel v. North Bergen,* 37 *N. J.* 369, 378–379 (1962). Here, the specifications dealt essentially with the furnishing of bus service and not, as did the contract, with the operation of the park-and-ride facility itself.

The fundamental philosophy of our competitive bidding statutes is that economy be secured and extravagance, fraud and favoritism prevented. *Waszen v. City of Atlantic City,* 1 *N. J.* 272, 283 (1949). Such statutes are designed to safeguard the public good and should be rigidly enforced by the courts to promote that objective. *Township of Hillside v. Sternin,* 25 *N. J.* 317, 322 (1957). This common good is best advanced by cultivating the most extensive competition possible under the circumstances and municipalities should organize their efforts in that direction. *Asbury Park Press, Inc. v. City of Asbury Park,* 23 *N. J.* 50, 54 (1956). To give meaning to this purpose, all bidders, actual and potential, must be put on the same footing. *Case v. Trenton,* 76 *N. J. L.* 696, 699 (E. & A. 1909). Therefore, *a municipality must "prescribe a common standard on all matters that are material to the proposals, to the end that interested persons may bid intelligently and will be induced to bid by the promise of impartiality which only specifications of that quality can give." Greenberg v. Fornicola,* 37 *N. J.* 1, 6 (1962) ; see also *Fereday & Meyer Co., Inc. v. Elizabeth Bd. of Public Works,* 27 *N. J.* 218, 223 (1958) ; *Camden Plaza Parking, Inc. v. City of Camden, supra,* 16 *N. J.* 150 at p. 159. [*Skakel v. North Bergen, supra,* 37 *N. J.* at 378–379; emphasis supplied]

We are convinced from our review of the record submitted on this appeal that the bidding practice used by the township which we find wanting was, in the circumstances, likely to affect the bidding process adversely. Every such practice is

\* \* \* prohibited, and all awards made or contracts entered into where any such practice may have played a part, will be set aside. This is so even though it is evident that in fact there was no corruption or any actual adverse effect upon the bidding process. [*Terminal*

470 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

*Const. Corp. v. Atlantic Cty. Sewerage Auth.*, 67 *N. J.* 403, 410 (1975)]

See also, *Waste Disposal, Inc. v. Roselle Park Mayor & Council,* 145 *N. J. Super.* 217, 221 (App. Div. 1976). Thus, important public interests are here involved. In the circumstances, it was error for the trial judge to have held that "scrutiny of the specifications" was barred by the time limitation prescribed by *R.* 4:69–6. The interest of justice requires enlargement of the 45–day period provided in paragraph (a) of that rule. *Brunetti v. New Milford,* 68 *N. J.* 576, 586–587 (1975); *Bernstein v. Krom,* 111 *N. J. Super.* 559, 564 (App. Div. 1970). Since a reversal is accordingly mandated, we find it unnecessary to comment on any of the other alleged infirmities discussed in the brief submitted on behalf of plaintiffs.

For reasons of public necessity and convenience, the operation of the Park-Ride facility by Suburban under the contract will be allowed to continue until November 18, 1978. By that time, the township should have completed its solicitation for and action upon new bids, in full compliance with the Local Public Contracts Law.

The judgment under review is reversed and the matter is remanded to the trial court for the entry of an order (1) setting aside the agreement of November 18, 1975, effective November 18, 1978, and (2) directing that the terms of any readvertisement for bids and the terms of the specifications be fully consistent with the applicable provisions of the Local Public Contracts Law and designed to encourage the broadest possible competitive bidding.