THE MONMOUTH PARK ASSOCIATION, PLAINTIFF IN ERROR, v. THE WALLIS IRON WORKS, DEFENDANT IN ERROR.

1. A court of law should read a written contract according to the obvious intention of the parties, in spite of clerical errors or omissions which can be corrected by perusing the whole instrument.

2. When damages may be sustained by the breach of a single stipulation, and they are uncertain in amount and not readily susceptible of proof under the rules of evidence, then, if the parties have agreed upon a sum of money as the measure of compensation for such breach, and that sum is not disproportionate to the presumable loss, it may be recovered as liquidated damages.

3. In a contract to complete a grand stand for a race course by a designated day, the contractor agreed to pay the owner $100 a day for every day that he should be in default after the day stated, which sum was thereby agreed upon, fixed and determined as the damages which the owner would suffer by reason of such default, and not by way of penalty. It was also agreed that the owner might deduct and retain the same out of any moneys becoming due to the contractor under the contract. *Held*, that the sum of $100 a day was liquidated damages.

4. In a building contract, certain matters connected with the work were left to the decision of the chief engineer of the owner—*Held* that, after the work was finished, a person who had been such engineer, but had left the owner's employ, was not the person intended.

5. In a building contract, the final payment was to be made on the contractor's furnishing satisfactory evidence that no liens or unsatisfied claims existed on the work. *Held*, that the fact that no claims were filed under the Mechanics' Lien law within one year after the filing of · the contract, afforded the required evidence.

The plaintiff brought an action in the Supreme Court against the defendant to recover $6,384.66 and interest, as a final balance for work done chiefly under a sealed contract between them, providing for the construction of a grand stand at the Monmouth Park race course. The present writ of error is prosecuted by the defendant to review questions of law raised at the trial in the Hudson Circuit.

The following is a copy of the contract :

"Articles of agreement made and concluded this first day of October A. D. 1889 by and between the Wallis Iron Works a corporation of New Jersey of the first part, and the Monmouth Park Association of the second part :

· " Witnesseth, that for and in consideration of the covenants and payments hereinafter mentioned, to be made and performed by the said party of the second part, the said party of the first part doth hereby covenant and agree to furnish all the labor and materials, and perform the work necessary to complete in the most substantial and workmanlike manner, to the satisfaction and acceptance of the chief engineer of the said party of the second part, a grand stand at the race course of said party of the second part, at Monmouth Park, Mon-

mouth Co., New Jersey, excepting the necessary excavation and incidental thereto the said work to be finished as described in the approved plans and following specifications, and agreeably to the directions received from the said chief engineer, on or before the first day of March 1890.   In case the said party of the first part shall to fully and entirely, and in conformity to the provissions and conditions of this agreement, perform and complete the said work, and each and every part and appurtenance thereto, within the time hereinbefore limited for such performance and completion, or within such further time as in accordance with the provissions of this agreement shall be fixed or allowed for such performance and completion, the said party of the first part shall and will pay to the said party of the second part the sum of one hundred dollars for each and every day that they, the said party of the first part, shall be in default, which said sum of one hundred dollars per day is hereby agreed upon, fixed and determined by the parties hereto as the damages which the party of the second part will suffer by reason of such default, and not by way of penalty.   And the said party of the second part may and shall deduct and retain the same out of any moneys which may be due or become due to the party of the first part under this agreement.

### "SPECIFICATION.

"The entire work to be constructed and finished in every part in a good, substantial and workmanlike manner, according to the accompanying drawings and specifications; to the full extent and meaning of the same, and to the entire satisfaction, approval and acceptance of the chief engineer and owners of the said party of the second part; and under the supervision and direction of such agent or agents as they may appoint.   Additional detail and working drawings will be furnished, in exemplification of the foregoing, from time to time as may be required; and it is distinctly understood, that all such additional drawings are to be considered as virtually embraced within and forming part of these specifications.

Figured dimensions shall in all cases be taken in preference to scale measurements.

" The said engineer shall have the right to make any alterations, additions, or omissions òf work ˙or materials herein specified, or shown on the drawings, ·during the progress of the structure, that he may find to be necessary and the same shall be acceded to by the said party of the first part, and carried into effect, without in any way violating or vitiating the contract. If any additions, alterations, or omissions are made in the structure during the progress of the work, the value of such shall be decided by the said chief engineer, who shall make an equitable allowance for the same, and shall add the amount of said allowance to the contract price of the work, if the cost has been increased; or shall deduct the amount, if the cost has been lessened, as he the said chief engineer, may deem just and equitable.

" The said party of the second party will pay for no extra work or material. unless ordered in writing by them through their treasurer.

"Any disagreement or difference between the parties to this contract, upon any matter or thing arising from these specifications; or the drawings to which· they refer; or to the contract for the work or the kind or quality of the work required thereby, shall be decided by the said chief engineer of the party of the second part, whose decision and interpretation of the same shall be considered final, conclusive, and binding upon both parties.

"All materials and labor used throughout the structure must be of the best of their several kinds, and subject to the approval of the chief engineer.

" The said chief engineer shall have full power at any time during the progress of the work to reject any materials that he may deem unsuitable for the purpose for which they were intended, or which are not in strict conformity with the spirit of these specifications. He shall also have the power to cause any inferior or unsafe work to be taken down and altered at the cost of the said party of the first part. Particular care

must be taken of all the finished work, which work must be covered up, and thoroughly protected from injury or deface-ment, during the erection and completion of the structure.

"All refuse material and rubbish that may accumulate during the progress of the work shall be removed from time to time as may be directed by the chief engineer; and on the completion of the work, the structure, grounds and streets be thoroughly cleaned up and the surplus material and rubbish removed. The said party of the second part will not trans-port free any of the workmen or materials for this work, but all materials must be *be* shipped in the name of the party of the first part, and in no case shall it be shipped in care of or in the name of the Company, or any of its officers or em-ployees, and said party of the first part must pay the regular freight rates arranged for with the freight department. And the said party of the second part doth promise and agree to pay to the said party of the first part for the work to be done under this contract the following prices, to-wit : One hundred and thirty-three thousand ($133,000) dollars.

" On or about the last day of each month, during the prog-ress of this work, an estimate shall be made of the relative value of the work done and delivered, to be judged by the engineer; and ninety per cent. of the amount of said estimate shall be paid to the party of the first part on or about the fifteenth day of the following month.

"And when all the work embraced in this contract is com-pleted, agreeably to the specifications, and in accordance with the directions and to the satisfaction and acceptance of the engineer, there shall be a final estimate made of said work according to the terms of this agreement, when the balance appearing due to the said party of the first part, shall be paid to them within thirty days thereafter, upon their giving a re-lease, under seal, to the party of the second part, from all claims and demands whatsoever growing in any manner out of this agreement, and upon their procuring and delivering to the parties of the second part, full releases, in proper form and duly executed, from mechanics and material men, of all

liens, claims, and demands for materials furnished and provided, and work and labor done and performed upon or about the work herein contracted for under this contract.

" It is further covenanted and agreed between the said parties, that the said party of the first part, will at all times give personal attention, by competent representative, who shall superintend the work.

" It is further agreed that the contractors are not to interfere in any way, with the construction of the bookmakers' stand, members' stand, or the paddocks, or other work. It is further agreed and understood that the work embraced in this contract shall be commenced within ten days from this date, and prosecuted with such force as the engineer shall deem adequate to its completion within the time specified ; and if at any time the said party of the first part shall refuse or neglect to prosecute the work with a force sufficient, in the opinion of the said engineer, for its completion within the time specified in this agreement, then, in that case, the said engineer in charge, or such agents as the engineer shall designate, may proceed to employ such a number of workmen, laborers and overseers as may, in the opinion of the said engineer, be necessary to insure the completion of the work within the time hereinbefore limited, at such wages as he may find necessary or expedient to give ; pay all persons so employed ; and charge over the amount so paid to the party of the first part as for so much money paid to them on said contract ; or for the failure to prosecute the work with an adequate force, for non-compliance with his directions in regard to the manner of constructing it, or for any other omission or neglect of the requirements of this agreement and specifications on the part of the party of the first part, the said engineer may, at his discretion, declare this contract or any portion or section embraced in it void.

"And the said party of the first part hath further covenanted and agreed *wo* take, use, provide, and make all proper, necessary, and sufficient precautions, safeguards, and protec-

tions against the occurrence or happening of any accidents,. injuries, damages, or hurt to any person or property during the progress of the construction of the work herein contracted for, and to be responsible for, and to idemnify and save harmless the said parties of the second part, and the said engineer, from the payments of all sums of money by reason of all or any such accidents, injuries, damages or hurt that may happen or occur upon or about said work, and from all fines, penalties, and loss incurred for or by reason of the violation of any city or borough ordinance or regulation, or law of the state, while the said work is in progress of construction.

"And it is mutually agreed and distinctly understood that the decision of the chief engineer shall be final and conclusive in any dispute which may arise between the parties to this agreement, relative to or touching the same.

" In witness whereof, that parties herein named have hereunto set their seals, and caused their presents to be signed by their secretary, the day and year herein first above named.

"As to Wallis Iron Works,          WALLIS IRON WORKS. (Seal.)
      JAMES I. TAYLOR,                Wm. T. Wallis, Sec'y
" Witness to signature of           THE MONMOUTH PARK ASS'N.
      A. J. Cassatt,                    by A. J. Cassatt,   (Seal.)
      T. M. CROFT.                              President.

" It is hereby further agreed that in addition to the work hereinbefore described and provided for the said party of the first part, shall provide as bearing pieces to receive ends of purlins and in lieu of the angle irons already provided for 3"x6" angle irons 10-8-10 lbs. per foot, and 7 feet long, well bolted to roof truss and to purlin ends.

" The party of the first part, will also construct complete the front steps to grand stand, as per revised sheet No. 26.

" In consideration of the foregoing changes, the party of the second part, agrees to pay the additional sum of nineteen hundred and seventy-one ($1971.61) dollars.

" Witness this 11th day of     WALLIS IRON WORKS. (Seal.)
    December 1889.          Wm. I. Wallis, Treas.
    T. M. CROFT.           THE MONMOUTH PARK ASS'N.
                      by A. J. Cassatt,   (Seal.)
                              President."

Added to this are " Revised Specifications," the last clause of which is :

## " PAYMENTS.

" On or about the first day of each month, the engineer will make an approximate estimate of the amount of work erected and delivered under these specifications during the preceding month, and the contractor will be paid ninety *per cent.* of the amount of these estimates. Thirty days after the acceptance of the completed work by the owner, the retained ten *per cent.* will be paid the contractor, upon his furnishing satisfactory evidence that no liens or unsatisfied claims exist on the work or any part of it."

These specifications were also signed and sealed by the parties.

The pleadings are sufficient to warrant the questions involved in the exceptions taken at the trial.

For the plaintiff in error, *Joseph D. Bedle.*

For the defendant in error, *Gilbert Collins.*

The opinion of the court was delivered by

DIXON, J. The first exception to be considered took its rise from the fact that the structure was not completed within the time limited by the contract, nor until ninety-four days after the expiration of a month's extension of that time. The defendant claimed a deduction or set-off of $100 for each day's delay.

The plaintiff met this claim by insisting that the clause in the contract mentioning the $100 per day is unintelligible and

therefore nugatory, because in its opening line it reads: "In case the said party of the first part shall  \*  \*  \*  to fully and entirely," &c., omitting any effective verb.

We agree, however, with the trial judge in thinking that the context shows the verb which should be supplied. It makes the $100 payable for each day that "the party of the first part shall be in default." This plainly indicates the verb "fail" as the omitted word, to be supplied as an equivalent for the expression "be in default."

The right of a court of law to read an instrument according to the obvious intention of the parties, in spite of clerical errors or omissions which can be corrected by perusing the instrument, is sufficiently vindicated by the decision of this court in *Sisson* v. *Donnelly*, 7 *Vroom* 432; see also *Burchell* v. *Clark*, 2 *C. P. D.* 88.

Taking the clause thus perfected, the plaintiff urged that the $100 a day was a penalty, and so the trial judge ruled, requiring that the defendant should prove the actual damages and be allowed only for what was proved. To this ruling the defendant excepted.

In determining whether a sum, which contracting parties have declared payable on default in performance of their contract, is to be deemed a penalty or liquidated damages, the general rule is that the agreement of the parties will be effectuated. Their agreement will, however, be ascertained by considering, not only particular words in their contract, but the whole scope of their bargain, including the subject to which it relates. If, on such consideration, it appears that they have provided for larger damages than the law permits, *e. g.*, more than the legal rate for the non-payment of money, or that they have provided for the same damages on the breach of any one of several stipulations, when the loss resulting from such breaches clearly must differ in amount, or that they have named an excessive sum in a case where the real damages are certain or readily reducible to certainty by proof before a jury, or a sum which it would be unconscionable to award, under any of these conditions the sum designated is deemed a penalty.

And if it be doubtful on the whole agreement whether the sum is intended as a penalty or as liquidated damages, it will be construed as a penalty, because the law favors mere indemnity. But when damages are to be sustained by the breach of a single stipulation, and they are uncertain in amount and not readily susceptible of proof under the rules of evidence, then, if the parties have agreed upon a sum as the measure of compensation for the breach, and that sum is not disproportionate to the presumable loss, it may be recovered as liquidated damages. These are the general principles laid down in the text books and recognized in the judicial reports of this state. *Cheddick's Executor* v. *Marsh,* 1 *Zab.* 463; *Whitefield* v. *Levy,* 6 *Vroom* 149; *Hoagland* v. *Segur,* 9 *Id.* 230; *Lansing* v. *Dodd,* 16 *Id.* 525.

In the present case the default consists of the breach of a single covenant, to complete the grand stand as described in the approved plans and specifications within the time limited. It is plain that the loss to result from such a breach is not easily ascertainable. The magnitude and importance of the grand stand may be inferred from its cost—$133,000. It formed a necessary part of a very expensive enterprise. The structure was not one that could be said to have a definable rental value. Its worth depended upon the success of the entire venture. How far the non-completion of this edifice might affect that success and what the profits or losses of the scheme would be were topics for conjecture only. The conditions therefore seem to have been such as to justify the parties in settling for themselves the measure of compensation.

The stipulations of parties for specified damages, on the breach of a contract to build within a limited time, have frequently been enforced by the courts. In *Fletcher* v. *Dycke,* 2 *T. R.* 32, £10 per week for delay in finishing the parish church; in *Duckworth* v. *Alison,* 1 *Mees. & W.* 412, £5 per week for delay in completing repairs of a warehouse; in *Legge* v. *Harlock,* 12 *Q. B.* 1015, £1 per day for delay in erecting a barn, wagon-shed and granary; in *Law* v. *Local Board of Redditch* (1892), *1 Q. B.* 127, £100 and £5 per week for

delay in constructing sewerage works; in *Ward* v. *Hudson River Building Co.*, 125 *N. Y.* 230, $10 a day for delay in erecting dwelling-houses, and in *Malone* v. *City of Philadelphia*, 23 *Atl. Rep.* 628, $50 a day for delay in completing a municipal bridge, were all deemed liquidated damages. Counsel has referred us to two cases of building contracts, where a different conclusion was reached—*Muldoon* v. *Lynch*, 66 *Cal.* 536, and *Clement* v. *Schuylkill River R. R. Co.*, 132 *Pa. St.* 445. In the former case a statutory rule prevailed, and in the latter the real damage was easily ascertainable and the stipulated sum was unconscionable. In the case at bar, we have no *data* for saying that $100 a day was unconscionable.

The sole question remaining on this exception, therefore, is whether the parties have agreed upon the sum named as liquidated damages.

Their language seems indisputably to have this meaning. They expressly declare the sum to be agreed upon as the damages which the defendant will suffer; they expressly deny that they mean it as a penalty, and they provide for its deduction and retention by the defendant in a mode which could be applied only if the sum be considered liquidated damages.

But it is argued that, as the contract authorized the engineer of the defendant to make any alterations or additions that he might find necessary during the progress of the structure, and required the plaintiff to accede thereto, it is unreasonable to suppose that the plaintiff could have intended to bind itself in liquidated damages for delay in completing such a changeable contract.

But this argument seems to be, aside from the present inquiry, which is, not whether the plaintiff became responsible for damages by reason of the non-completion of the grand stand on the day named, but whether, if it did become so responsible, those damages are liquidated by the contract. On the question first stated, changes ordered by the engineer may afford matter for consideration; on the second question, they are irrelevant.

Certainly the bills of exceptions do not indicate any altera-
tions or additions which, as matter of law, would relieve the
plaintiff from responsibility for the admitted delay, and con-
sequently there may have been ground for considering the
defendant's damages. If there was, the amount of the dam-
ages was adjusted by the contract at $100 per day.

We think the ruling at the Circuit, on this point, was
erroneous.

We think, also, that the letter, *Exhibit P 8*, written Sep-
tember 10th, 1890, by F. Latourette to the plaintiff, was
illegally received in evidence. It was offered and admitted
as a decision by the chief engineer of the defendant under the
contract. Since it was written after the completion of the
work, and after the writer had ceased to be the engineer of
the defendant, and without notice to the defendant, it could
not possess the character attributed to it.

The only other exception which it appears useful to notice
is that relating to the existence of claims by outside parties.

The agreement contains two clauses on this subject—one
under the head "Specification;" the other under the head
"Revised Specifications." It seems proper to hold that the
latter clause is substituted in the contract for the former, and,
therefore, it only need be considered. It reads: "Thirty
days after the acceptance of the completed work by the owner,
the retained ten *per cent.* will be paid the contractor, upon his
furnishing satisfactory evidence that no liens or unsatisfied
claims exist on the work or any part of it."

. The expression "liens or unsatisfied claims *on the work*"
must mean claims which can be enforced against the work,
and such claims could exist only under our Mechanics' Lien
law. By "liens" the parties intended claims filed under that
law; by "unsatisfied claims" they intended claims which
were not, but might be, filed under that law.

The statute (*Rev., p. 668, § 2*) provides "that when any
building shall be erected in whole or in part by contract in
writing, such building and the land whereon it stands shall
be liable to the contractor alone for work done or materials

furnished in pursuance of such contract; *provided,* such contract or a duplicate thereof be filed in the office of the clerk of the county in which such building is situate, before such work done or materials furnished;" and (§ 13) "that no debt shall be a lien by virtue of this act, unless a claim is filed as hereinbefore provided within one year from the furnishing the materials or performing the labor for which such debt is due."

The contract between these parties was filed January 2d, 1890.  Hence, no liens could arise in favor of outside parties for work done or materials furnished after that date.  For work done or materials furnished before that date, no debt would be a lien unless a claim were filed within a year, *i. e.,* before January 2d, 1891.  At the date last named no such claim was filed, and so far as appears no such claim was ever filed.  The suit was commenced March 12th, 1891.

We think these facts furnished satisfactory evidence that there were no liens or unsatisfied claims on the work when the action was brought, and that on this point there was no error at the trial.

The other exceptions adverted to by counsel for the defendant are either untenable or on questions not likely to arise upon a new trial.

Let the judgment be reversed and a *venire de novo* be awarded.


*For affirmance*—None.


*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, DIXON, GARRISON, MAGIE, REED, BOGERT, BROWN, CLEMENT, SMITH.    11.