645 A.2d 100

WASSERMAN'S INC. AND JO–RO, INC., PLAINTIFFS–
RESPONDENTS, v. TOWNSHIP OF MIDDLETOWN,
DEFENDANT–APPELLANT.

Argued January 31, 1994—Decided August 2, 1994.

*William F. Dowd* argued the cause for appellant (*Dowd & Reilly*, attorneys; *Mr. Dowd* and *Bernard M. Reilly*, on the brief).

*Roy D. Curnow* argued the cause for respondents (*Drazin and Warshaw*, attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Pursuant to a public advertisement for bids, plaintiff Wasserman's Inc. (Wasserman's) and defendant, Township of Middletown (the Township or Middletown), entered into a commercial lease for a tract of municipally-owned property. The agreement contained a clause providing that if the Township cancelled the lease, it would pay the lessee, Wasserman's, a pro-rata reimbursement for

any improvement costs and damages of twenty-five percent of the lessee's average gross receipts for one year. In 1989, the Township cancelled the lease and sold the property, but refused to pay the agreed damages. On cross-motions for summary judgment, the Law Division held that the lease and the cancellation clause were enforceable. It subsequently required the Township to pay damages in the amount of $346,058.44 plus interest. In an unreported opinion, the Appellate Division affirmed. We granted certification, 134 *N.J.* 478, 634 *A.*2d 525 (1993), and now affirm the judgment on liability but reverse and remand for a plenary trial on damages. We conclude that the lease is enforceable. We affirm the award of renovation costs and remand to the Law Division the issue of the enforceability of the stipulated damages clause.

–I–

The Township owned a parcel of approximately 20,500 square feet in a commercial area at 89 Leonardville Road, in the Belford section of the Township. From 1948 to 1968, Wasserman's leased the property from the Township for a 3,200–square–foot general store. In 1969, the Township advertised for bids to lease the property, which the Township evaluated at $47,500. Wasserman's submitted the sole bid. After rejecting Wasserman's bid, the Township again advertised in May 1970. Once again, Wasserman's submitted the only bid. Subsequent negotiations resulted in the Township adopting a resolution approving the lease on September 22, 1970. The parties signed the lease on May 21, 1971.

At the center of the dispute is the cancellation clause in the lease. The bid specifications provided that if the Township cancelled the lease, it would pay the tenant a pro-rata reimbursement of improvement costs. Consistent with the specifications, the clause provides in part for reimbursement: "payment to be made shall be (1.) total value of all improvements made by lessee at time of construction × (multiplied by) years remaining in Lease term

÷ (divided by) total number of years in Lease term." More controversial is the second half of the clause, the terms of which were not included in the original specifications. That provision requires the Township to pay "(2.) twenty-five percent of the lessee[']s average gross receipts for one year (to be computed by + (adding) the lessee[']s total gross receipts for the lessee[']s three full fiscal years immediately preceding the time of cancellation of the lease and ÷ (dividing by) 12 (twelve)[) ]." The lease also provided for a fixed monthly rental of $458.33, with no escalation for the entire thirty-year term.

Wasserman's made the agreed improvements, spending $142,-336.01 in 1971 on the expansion and renovation of the store, which now is approximately 5,600 square feet. In August 1973, Wasserman's sold "the business," presumably the corporate assets, and sublet the premises to Rocco Laurino doing business as Jo–Ro, Inc. (Jo–Ro). The sublease provided that Jo–Ro was to pay Wasserman's a monthly rent of $1,850. Wasserman's and Jo–Ro, jointly described as "plaintiffs," provided for an allocation of any payments made by the Township if it cancelled the lease.

In 1977, Samuel Krawet and Arnold Kornblum purchased from Laurino all of the Jo–Ro stock for $95,000. In connection with the sale, Laurino executed an affidavit, representing that the lease between Middletown and Wasserman's was in full force and effect. Additionally, the Township sent a letter to Wasserman's stating that the Township would permit subletting the property to Jo–Ro.

By letter dated December 7, 1987, the Township cancelled the lease effective December 31, 1988. Krawet and Kornblum vacated the premises, leaving them without a place for their business. In June 1989, the Township, after advertising the property at public auction, sold it for $610,000, nearly thirteen times the value of the property at the time the Township had leased it to Wasserman's in 1971.

■ The statute in effect when Wasserman's and the Township executed the lease provided:

> Every municipality may lease for fixed and limited terms to any person any land or building of the municipality not presently needed for public use. If any portion of a building owned by a municipality is not presently needed for the use of the municipality, the governing body may rent such portion for private purposes to the person who will pay the highest rent therefor, for any use not detrimental to such building or the use of the remainder by the municipality.
>
> [*N.J.S.A.* 40:60–42, *repealed by L.* 1971, c. 199, § 29 (effective July 1, 1971).]

On July 1, 1971, six weeks after the Township and Wasserman's signed the lease, *N.J.S.A.* 40A:12–14 took effect. The new statute replaced *N.J.S.A.* 40:60–42 and requires public bidding for leases of unused municipal property. *N.J.S.A.* 40A:12–14(a) provides:

> In the case of a lease to a private person ..., said lease shall be made to the highest bidder by open public bidding at auction or by submission of sealed bids. Advertisement of the method of bidding shall be published in a newspaper circulating in the municipality or municipalities in which the leasehold is situated by two insertions at least once a week during two consecutive weeks; the lease publication to be not earlier than seven days prior to the letting of the lease. The governing body may, by resolution, fix a minimum rental with the reservation of the right to reject all bids where the highest bid is not accepted. Notice of such reservation shall be included in the advertisement of the letting of the lease and public notice thereof shall be given of the time of the letting of the lease. Such resolution may provide that upon the completion of the bidding, the highest bid may be accepted or all of the bids may be rejected. It shall also set out the conditions, restrictions and limitations upon the tenancy subject to the lease. Acceptance or rejection of the bid or bids shall be made not later than at the second regular meeting of the governing body following the completion of the bidding, and, if the governing body shall not so accept such highest bid, or reject all bids, said bids shall be deemed to have been rejected. Any such award may be adjourned at the time advertised for not more than one week without readvertising.

Contrary to *N.J.S.A.* 40:60–42, *N.J.S.A.* 40A:12–14(a) requires public bidding if a municipality proposes to lease property to a private person and requires that the lease "shall be made to the highest bidder...." The Township argues that *N.J.S.A.* 40A:12–14(a) should apply retroactively to void the lease. We disagree.

–II–

Plaintiffs sued for breach of contract, seeking in part damages under the terms of the lease. The Township filed an answer and counterclaim seeking a declaration of invalidity of that part of the cancellation clause that required the Township to pay as damages twenty-five percent of the lessee's gross receipts. Originally the

Township also disputed its obligation to reimburse Wasserman's for a pro-rata portion of the cost of renovations, but it now concedes the validity of that provision. The parties filed cross-motions for summary judgment.

The Law Division initially granted plaintiffs a partial summary judgment according "full force and effect" to the lease and the cancellation clause. On a subsequent motion, the court awarded plaintiffs damages of $346,058.44 plus ten-percent prejudgment interest. The trial court calculated damages as follows:

$142,336.01 (construction costs) multiplied by 11.75 (remaining years) divided by 30 years (term of lease) for a total of $55,748.27.

$3,483,722.25 (Jo–Ro's gross receipts for the years 1985, 1986, 1987) divided by 12 equalling $290,310.18.

| | |
|---|---|
| Construction compensation | $ 55,748.27 |
| Gross receipts compensation | + 290,310.18 |
| Total amount due | $346,058.45 |

The Appellate Division affirmed substantially for the reasons stated by the Law Division. We affirm the judgment on liability. We find that the lease does not violate *N.J.S.A.* 40:60–42, which was in effect at the time of the agreement, and that *N.J.S.A.* 40A:12–14 does not apply retroactively.

–III–

–A–

The Township first argues that the lease violates the requirements for a valid public contract. It points to the absence from the bid specifications of any reference to a cancellation clause providing for compensation based on gross receipts. Further, it argues that the former Township officials acted without any authority in subsequently agreeing to such a clause. We reject both arguments. When the parties negotiated the terms of the

lease in 1970 and 1971, the governing statute, *N.J.S.A.* 40:60–42, did not require public bidding for a lease to a private party. *Robbins v. City of Jersey City*, 23 *N.J.* 229, 236, 128 *A.*2d 673 (1957); *Asbury Park Press, Inc. v. City of Asbury Park*, 19 *N.J.* 183, 192, 115 *A.*2d 564 (1955). It required only that the "person pay the highest rent therefor." Here, Wasserman's not only paid that rent, but the Township received no other offers.

We find, as did both the Law Division and the Appellate Division, that the Township, when negotiating the lease, satisfied the requirements of the then-controlling statute. Although the Township advertised for public bids, the advertisement did not prevent it from disregarding the bids and making the best deal that it could for the Township. *Schwartz & Nagle Tires, Inc. v. Board of Chosen Freeholders*, 6 *N.J.Super.* 79, 81, 69 *A.*2d 885 (App.Div.1949), *certif. denied*, 4 *N.J.* 127, 71 *A.*2d 681 (1950). A municipality that advertises for public bids is not obligated to accept the low bid if the bidding statutes do not apply. *See A.C. Schultes & Sons v. Township of Haddon*, 8 *N.J.* 103, 108, 83 *A.*2d 896 (1951) (holding that "[e]ven though the municipality actually advertised . . ., if the [bidding] statutes are inapplicable, there is no obligation upon the city to award the contract to the low bidder"). Unless the public bidding statutes apply, their requirements do not control the award of bids. *Peter's Garage, Inc. v. City of Burlington*, 121 *N.J.L.* 523, 528, 3 *A.*2d 634 (Sup.Ct.), *aff'd*, 123 *N.J.L.* 227, 8 *A.*2d 579 (E. & A.1939).

When the Township first advertised in 1969, only Wasserman's, the tenant in possession, submitted a bid. In 1970, Wasserman's again was the sole bidder. The record reveals that when settling the final terms of the lease, the parties in good faith negotiated the Township's right to terminate the lease. Public bidding is not impaired when a municipality subsequently bargains for a needed change in a contract. *Greenberg v. Fornicola*, 37 *N.J.* 1, 10, 178 *A.*2d 339 (1962). At no time has the Township ever submitted a shred of evidence of bad faith on anyone's part in those negotiations. Nor does any evidence suggest that a poten-

tial bidder would have found the property more attractive if it had known of the modifications to the lease. Not until 1989, after it had sold the property at a substantial gain, did the Township question the lease's terms.

We need not go so far as the Law Division, which found the Township's position "bizarre." For our purposes, it suffices that the lease amendments were not detrimental to the Township's interests, *Skakel v. Township of North Bergen*, 37 *N.J.* 369, 380, 181 *A.*2d 473 (1962), and that the executed lease was substantially similar to the lease as described in the bid specifications. *See Kotter v. Township of East Brunswick*, 160 *N.J.Super.* 462, 469, 390 *A.*2d 634 (App.Div.1978) (finding under Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –49, that "[t]here must be a reasonable similarity between that which is solicited and the terms of the contract entered into").

Even when public-bidding statutes apply, they do not foreclose changes "when the public body in its own interest seeks an amendment to meet an unanticipated development in circumstances in which new bidding would be inappropriate or impractical." *Greenberg, supra*, 37 *N.J.* at 10, 178 *A.*2d 339. Here, new bidding would have been "inappropriate" and "impractical." After two invitations to bid, the Township attracted only the tenant in possession, Wasserman's.

The purpose of competitive bidding is to obtain the best economic result for the public entity and ultimately for the taxpayer. *See id.* at 6, 178 *A.*2d 339. Any modification must "not be detrimental to the interests of the municipality and must not make the proposal more attractive to any potential bidders." *Skakel, supra*, 37 *N.J.* at 380, 181 *A.*2d 473. Nothing in the record indicates that a third attempt would have attracted other bidders. The absence of a provision to escalate rent and the inclusion of one to compensate the tenant if the Township sold the property do not necessarily render the lease "detrimental to the interests of the municipality." *Ibid.* To the contrary, the record suggests that Wasserman's would not have signed the lease if the Township had

not made those concessions. In the absence of any evidence of bad faith, dishonesty, or corruption, we conclude that the parties negotiated in good faith over the details of the lease.

–B–

We also reject the Township's argument that *N.J.S.A.* 40A:12–14, which took effect six weeks after the signing of the lease, determines the lease's validity. Nothing in the statutory language or history suggests that the Legislature intended that the statute should be applied retroactively. As salutary as the provisions of *N.J.S.A.* 40A:12–14 may be in requiring public bidding for the lease of municipal property, the Township has made no showing that those provisions should apply to leases executed before the effective date of the statute. Therefore, *N.J.S.A.* 40:60–42, which was still in effect at the time of the execution of the lease, governed the validity of the formation of the lease. *See Board of Educ. v. Employees Ass'n,* 178 *N.J.Super.* 477, 480, 429 *A.*2d 429 (App.Div.1981) (stating that validity of contract is determined by law in effect at time of contracting and that subsequent change in law cannot make agreement illegal, if legal when made). Finally, the retroactive application of *N.J.S.A.* 40A:12–14 to invalidate the lease nineteen years after its execution, with eleven years yet to run, would create the risk of contravening the contract clauses of article 1, section 10 of the federal constitution and article IV, section 7, paragraph 3 of the New Jersey Constitution.

The lease was validly executed in accordance with *N.J.S.A.* 40:60–42, the statute in effect at the time of execution. We decline to apply *N.J.S.A.* 40A:12–14 retroactively. Thus, we affirm the partial summary judgment sustaining the validity of the lease. Before us, the Township does not dispute the award of $55,748.27 in damages to compensate Wasserman's for improving the premises.

–IV–

■ The provision in the termination clause providing for damages based on the lessee's gross receipts presents a more difficult

issue. The issue is whether that provision is an enforceable liquidated damages provision or is an unenforceable penalty clause.

Disapproval of penalty clauses originated at early common law when debtors bound themselves through sealed penalty bonds for twice the amount of their actual debts. Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 *Colum.L.Rev.*, 554, 554 (1977) (hereinafter Goetz & Scott). Because clauses in penalty bonds "carried an unusual danger of oppression and extortion," equity courts refused to enforce them. *Id.* at 555. "This equitable rule, designed to prevent over-reaching and to give relief from unconscionable bargains, was later adopted by courts of law." John D. Calamari & Joseph M. Perillo, *The Law of Contracts*, § 14–31 at 639 (3d ed. 1987) (hereinafter Calamari & Perillo). In a sense, judicial reluctance to enforce penalty clauses is a product of history.

For more than five centuries, courts have scrutinized contractual provisions that specify damages payable in the event of breach. *Wassenaar v. Panos,* 111 *Wis.*2d 518, 331 *N.W.*2d 357, 362 (1983); Goetz & Scott, *supra,* 77 *Colum.L.Rev.* at 554. The validity of these "stipulated damage clauses" has depended on a judicial assessment of the clauses as an unenforceable penalty or as an enforceable provision for "liquidated damage." Thus, " '[l]iquidated damages' and 'penalties' are terms used to reflect legal conclusions as to the enforceability or nonenforceability, respectively, of stipulated damage clauses." Kenneth W. Clarkson et al., *Liquidated Damages v. Penalties: Sense or Nonsense?,* 1978 *Wis.L.Rev.* 351, 351 n. 1 (hereinafter Clarkson).

Thirty years ago, the Appellate Division distinguished liquidated damages and penalty clauses:

*Liquidated damages* is the sum a party to a contract agrees to pay if he breaks some promise, and which, having been arrived at by a good faith effort to estimate in advance the actual damages that will probably ensue from the breach, is legally recoverable as agreed damages if the breach occurs. A *penalty* is the sum a party

agrees to pay in the event of a breach, but which is fixed, not as a pre-estimate of probable actual damages, but as a punishment, the threat of which is designed to prevent the breach.

Parties to a contract may not fix a penalty for its breach. The settled rule in this State is that such a contract is unlawful.

[*Westmount Country Club v. Kameny,* 82 *N.J.Super.* 200, 205, 197 *A.2d* 379 (1964) (citations omitted).]

Stating the distinction, however, has been easier than describing its underlying rationale. " '[T]he ablest judges have declared that they felt themselves embarrassed in ascertaining the principle on which the decisions [distinguishing penalties from liquidated damages] were founded.' " E. Allan Farnsworth, *Contracts* § 12.18 at 937 (2d ed. 1990) (alterations in original) (quoting *Cotheal v. Talmage,* 9 *N.Y.* 551, 553 (1854)); *see also Giesecke v. Cullerton,* 280 *Ill.* 510, 117 *N.E.* 777, 778 (1917) (observing that "no branch of the law is involved in more obscurity by contradictory decisions").

As the law has evolved, a stipulated damage clause "must constitute a reasonable forecast of the provable injury resulting from breach; otherwise, the clause will be unenforceable as a penalty and the non-breaching party will be limited to conventional damage measures." Goetz & Scott, *supra,* 77 *Colum.L.Rev.* at 554. So viewed, "reasonableness" emerges as the standard for deciding the validity of stipulated damages clauses. *See Wassenaar, supra,* 331 *N.W.2d* at 361 (noting that "[t]he overall single test of validity is whether the clause is reasonable under the totality of circumstances").

The reasonableness test has developed as a compromise between two competing viewpoints concerning stipulated damages clauses. The Wisconsin Supreme Court has described the policy considerations underlying these viewpoints:

Enforcement of stipulated damages clauses is urged because the clauses serve several purposes. The clauses allow the parties to control their exposure to risk by setting the payment for breach in advance. They avoid the uncertainty, delay, and expense of using the judicial process to determine actual damages. They allow the parties to fashion a remedy consistent with economic efficiency in a competitive market, and they enable the parties to correct what the parties perceive to be inadequate judicial remedies by agreeing upon a formula which may include damage elements too uncertain or remote to be recovered under rules of damages

applied by the courts. In addition to these policies specifically relating to stipulated damages clauses, considerations of judicial economy and freedom of contract favor enforcement of stipulated damages clauses.

A competing set of policies disfavors stipulated damages clauses, and thus courts have not been willing to enforce stipulated damages clauses blindly without carefully scrutinizing them. Public law, not private law, ordinarily defines the remedies of the parties. Stipulated damages are an exception to this rule. Stipulated damages allow private parties to perform the judicial function of providing the remedy in breach of contract cases, namely, compensation of the nonbreaching party, and courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages. Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable *in terrorem* agreement to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective.

[*Id.* at 362.]

Consistent with the principle of reasonableness, New Jersey courts have viewed enforceability of stipulated damages clauses as depending on whether the set amount "is a reasonable forecast of just compensation for the harm that is caused by the breach" and whether that harm "is incapable or very difficult of accurate estimate." *Westmount Country Club, supra,* 82 *N.J.Super.* at 206, 197 *A.*2d 379; *accord Monmouth Park Ass'n v. Wallis Iron Works,* 55 *N.J.L.* 132, 140–41, 26 *A.* 140 (E. & A. 1892); *Wood v. City of Ocean City,* 85 *N.J.Eq.* 328, 330, 96 *A.* 489 (Ch.1915); *see 218–220 Market St. Corp. v. Krich–Radisco, Inc.,* 124 *N.J.L.* 302, 305, 11 *A.*2d 109 (E. & A.1939).

Uncertainty or difficulty in assessing damages is best viewed not as an independent test, Calamari and Perillo, *supra,* § 14–31 at 641; Goetz & Scott, *supra,* 77 *Colum.L.Rev.* at 559 (stating, "liquidated damages provisions have seldom been voided solely because the damages were easy to estimate"), but rather as an element of assessing the reasonableness of a liquidated damages clause, *Wassenaar, supra,* 331 *N.W.*2d at 363. Thus, "[t]he greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable." *Ibid.*

Some courts in other jurisdictions have also considered whether the parties intended the clause to be one for liquidated damages. Clarkson, *supra,* 1978 *Wis.L.Rev.* at 353. Even those courts

recognize that "subjective intent has little bearing on whether the clause is objectively reasonable." *Wassenaar, supra,* 331 *N.W.*2d at 363. For the past eighty years, New Jersey courts have relied on the "circumstances of the case and not on the words used by the parties" in determining the enforceability of stipulated damages clauses. *Gibbs v. Cooper,* 86 *N.J.L.* 226, 227–28, 90 *A.* 1115 (E. & A.1914); *see also* Farnsworth, *supra,* § 12.18 at 939 ("the parties' own characterization of the sum as 'liquidated damages' or as a 'penalty' is not controlling"); Clarkson, *supra,* 1978 *Wis. L.Rev.* at 353 (same); *cf. Monmouth Park Ass'n, supra,* 55 *N.J.L.* at 141, 26 *A.* 140 (stating, "if it be doubtful on the whole agreement whether the sum is intended as a penalty or as liquidated damages, it will be construed as a penalty, because the law favors mere indemnity"). We conclude that the parties' characterization of stipulated damages as "liquidated damages" or as a "penalty" should not be dispositive.

Although the Appellate Division has indicated that courts should determine the enforceability of a stipulated damages clause as of the time of the making of the contract, *Westmount Country Club, supra,* 82 *N.J.Super.* at 206, 197 *A.*2d 379, the modern trend is towards assessing reasonableness either at the time of contract formation or at the time of the breach. Calamari & Perillo, *supra,* § 14–31 at 642 (stating, "there are two moments at which the liquidated damages clause may be judged rather than just one").

Actual damages, moreover, reflect on the reasonableness of the parties' prediction of damages. "If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable." *Wassenaar, supra,* 331 *N.W.*2d at 364; *see* 5A. *Corbin on Contracts* § 1063 (1951) ("It is to be observed that hindsight is frequently better than foresight, and that, in passing judgment upon the honesty and genuineness of the pre-estimate made by the parties, the court cannot help but be influenced by its knowledge of subsequent events."). Determining enforceability at the time either when the contract is made or

when it is breached encourages more frequent enforcement of stipulated damages clauses. Calamari & Perillo, *supra*, § 14–31 at 642.

Two of the most authoritative statements concerning liquidated damages are contained in the Uniform Commercial Code and the *Restatement (Second) of Contracts*, both of which emphasize reasonableness as the touchstone. Farnsworth, *supra*, § 12.18 at 938. Thus, section 2–718 of the Uniform Commercial Code, adopted in New Jersey as *N.J.S.A.* 12A:2–718, provides:

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

Similarly, the Second Restatement (Second) of Contracts provides:

Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.

[*Restatement (Second) of Contracts* § 356(1) (1981).]

Consistent with the trend toward enforcing stipulated damages clauses, the Appellate Division has recognized that such clauses should be deemed presumptively reasonable and that the party challenging such a clause should bear the burden of proving its unreasonableness. *Central Steel Drum Co. v. Gold Cooperage, Inc.*, 200 *N.J.Super.* 251, 265, 491 *A.*2d 49 (concluding "that in the context of commercial parties having comparable bargaining power there should be presumptive validity of a liquidated damage clause"), *certif. denied*, 101 *N.J.* 303, 501 *A.*2d 960 (1985), *overruled on other grounds, Kutzin v. Pirnie*, 124 *N.J.* 500, 591 *A.*2d 932 (1991); *see also J.L. Davis & Assocs. v. Heidler*, 263 *N.J.Super.* 264, 274–75, 622 *A.*2d 923 (App.Div.1993) (determining that "the party being assessed liquidated damages has the burden 'to offer proof of contractually acceptable excuses in order to avoid the application of the liquidated damage clause' ") (quoting *Monsen Eng'g Co. v. Tami–Githens, Inc.*, 219 *N.J.Super.* 241, 250, 530 *A.*2d 313 (App.Div.1987)). *But see Utica Mut. Ins. Co. v. DiDonato*, 187 *N.J.Super.* 30, 42–43, 453 *A.*2d 559 (App.Div.1982) (holding

that party advocating enforcement of stipulated damages clause has burden of proof and persuasion). Similarly, most courts today place the burden on the party challenging a stipulated damages clause. Calamari & Perillo, *supra*, § 14–31 at 643; *see, e.g., Mattvidi Assocs. v. Nationsbank of Va.*, 100 *Md.App.* 71, 639 *A.*2d 228, 238 (1994) (noting that "[n]ot only is placing the burden of proof on the party seeking to invalidate a liquidated damages clause the majority rule, it is also the only rule consistent with normal principles of contract law"); *Haromy v. Sawyer*, 98 *Nev.* 544, 654 *P.*2d 1022, 1023 (1982) (observing that "[g]enerally, liquidated damage provisions are prima facie valid"); *Wassenaar, supra*, 331 *N.W.*2d at 367 (determining that "the party challenging the contract[ ] carries the burden of proving that the stipulated amount of damages is grossly disproportionate to the actual harm and thus unreasonable"). Thus, the party challenging a stipulated damages clause "must establish that its application amounts to a penalty." *Haromy, supra*, 654 *P.*2d at 1023.

In commercial transactions between parties with comparable bargaining power, stipulated damage provisions can provide a useful and efficient remedy. *See Priebe & Sons v. United States*, 332 *U.S.* 407, 411–13, 68 *S.Ct.* 123, 126, 92 *L.Ed.* 32, 38–39 (1947) (observing that "[t]oday the law does not look with disfavor upon 'liquidated damages' provisions in contracts[ ] [w]hen they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach"). Sophisticated parties acting under the advice of counsel often negotiate stipulated damages clauses to avoid the cost and uncertainty of litigation. Such parties can be better situated than courts to provide a fair and efficient remedy. Absent concerns about unconscionability, courts frequently need ask no more than whether the clause is reasonable. We do not reach the issue of the enforceability of liquidated damage clauses in consumer contracts. Notwithstanding the presumptive reasonableness of stipulated damage clauses, we are sensitive to the possibility that, as their history discloses, such clauses may be unconscionable and unjust. *Foont–Freedenfeld Corp. v. Electro–Protective Corp.*, 126 *N.J.Super.* 254, 258, 314 *A.*2d 69 (App.Div.

1973), *aff'd o.b.,* 64 *N.J.* 197, 314 *A.*2d 68 (1974); *Westmount Country Club, supra,* 82 *N.J.Super.* at 206, 197 *A.*2d 379; Goetz & Scott, *supra,* 77 *Colum.L.Rev.* at 588 (stating that "in the absence of bargaining unfairness, a stipulated damage clause reflects equivalent value").

–V–

■ The purpose of a stipulated damages clause is not to compel the promisor to perform, but to compensate the promisee for non-performance. Farnsworth, *supra,* § 12.18 at 936. Accordingly, provisions for liquidated damages are enforceable only if "the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach." *Westmount Country Club, supra,* 82 *N.J.Super.* at 206, 197 *A.*2d 379; *see also Restatement (Second) of Contracts, supra,* § 356 comment a (stating, "The parties to a contract may effectively provide in advance the damages that are to be payable in the event of breach as long as the provision does not disregard the principle of just compensation."). One injured by a breach of contract is entitled only to just and adequate compensation. *McDaniel Bros. Constr. Co. v. Jordy,* 195 *So.*2d 922, 925 (Miss.1967). Thus, the subject cancellation clause is unreasonable if it does more than compensate plaintiffs for their approximate actual damages caused by the breach.

Whether measured from the time of execution of the contract or from the termination of the lease, *see Westmount Country Club, supra,* 82 *N.J.Super.* at 206, 197 *A.*2d 379, damages based on gross receipts run the risk of being found unreasonable. Generally speaking, gross receipts do not reflect actual losses incurred because of the cancellation. Gross receipts, unlike net profits, do not account for ordinary expenses; nor do they account for the expenses specifically attributable to the breach. Here, we cannot determine whether the stipulated amount was based on damages that would likely flow from a breach or whether it is an arbitrary figure unrelated to any such damages.

A dearth of authority in this state compels us to consider opinions from other states. In *Peerless Enterprises, Inc. v. T.N.T., Inc.*, 511 *P*.2d 538 (1973), the Colorado Court of Appeals upheld the trial court's conclusion that a stipulated damages provision based on gross receipts "did not bear a reasonable relationship to the actual losses which were likely to be suffered by plaintiff and that the clause was therefore a penalty clause." *Id.* at 539. The plaintiff, a vending machine operator, sued the defendant, a bar owner, to collect on a stipulated damages clause included in a vending-machine-supply contract. Halfway through the term of the contract, the defendant cancelled the agreement. The clause provided that on cancellation, the plaintiff would be entitled to an amount equal to the monthly gross receipts from the machines for the duration of the contract period. In rejecting the clause, the court held that "[g]ross receipts do not bear a close enough relationship to the probable loss suffered by plaintiff to justify the enforcement of the clause in question as a liquidated damages provision." *Ibid.*

Similarly, in *A.V. Consultants, Inc. v. Barnes*, 978 *F*.2d 996 (1992), the Seventh Circuit refused to enforce a stipulated damages provision in a contract between the plaintiff consulting firm and the City of Gary, Indiana. The clause provided that if the City terminated the agreement, it would still be responsible for paying the plaintiff the balance of the administrative fees due for the remainder of the contract term. Under the clause, the City would have to pay the plaintiff as if the plaintiff were still rendering a service. The court regarded the clause as providing for an unenforceable penalty, reasoning that if the clause were to be enforced, the plaintiff would recover doubly: it "would be receiving its expected profit *plus* the value of its services— services AVC was free to sell elsewhere." *Id.* at 1001. "These damages would certainly be disproportionate to AVC's loss." *Ibid.*

Courts also have disapproved the use of gross receipts as a measure of damages apart from stipulated damages clauses. In a

Colorado case involving a landlord's breach of a lease, the trial court allowed the jury to determine damages based only on the tenant's loss of gross profits. The Supreme Court of Colorado reversed, stating that "[g]ross profits do not furnish the proper basis for damages for loss of business.... Damages sustained by a business must relate to loss of net profits; they may not be speculative, remote, imaginary, or impossible of ascertainment." *Lee v. Durango Music*, 144 *Colo.* 270, 355 *P.*2d 1083, 1087 (1960).

Evaluating damages based on gross income is problematic partly because such damages would be too speculative or uncertain. *Garcia v. Mountain States Tel. & Tel. Co.*, 315 *F.*2d 166, 168–69 (10th Cir.1963). Assessing damages only from gross receipts has been described as an exercise in "pure guess and speculation." *Id.* at 169; *see also Williams v. Bone*, 74 *Idaho* 185, 259 *P.*2d 810, 812 (1953) (lamenting that damages ascertained only from gross receipts "is so uncertain and speculative as to what the loss might be, if any, that it is not a proper criterion in fixing the loss"); *Kenford Co. v. County of Erie*, 67 *N.Y.*2d 257, 502 *N.Y.S.*2d 131, 132, 493 *N.E.*2d 234, 235 (Ct.App.1986) (ruling that damages from breach of contract "may not be merely speculative, possible or imaginary").

Likewise, in *Rainbow Island Productions, Ltd. v. Leong*, 44 *Haw.* 134, 351 *P.*2d 1089 (1960), the Supreme Court of Hawaii found that because the operating costs of plaintiff's motion picture corporation were forty-percent of gross income, damages for interruption of the business could not be determined by total gross revenues. *See also Lockwood Grader Corp. v. Backhaus*, 129 *Colo.* 339, 270 *P.*2d 193, 199 (1954) (stating that proof of gross receipts is insufficient and that "[w]ithout proof of profits there is no proof of damages"); *Williams, supra*, 259 *P.*2d at 811–12 (observing "there is [no] authority to the effect that the jury could fix compensatory damages from evidence showing only gross income without deduction of expenses and costs of operation, from which the net profits or decrease in net income could be determined").

Furthermore, basing damages on gross profits could award the plaintiff a windfall. *See Perico, Ltd. v. Ice Cream Indus., Inc.,* 1990 *WL* 11539, at *6 (S.D.N.Y. Feb. 9, 1990) (holding that "[t]o award plaintiff the gross receipts it expected from customers … would be to confer an unwarranted windfall"); *Jerry Alderman Ford Sales, Inc. v. Bailey,* 154 *Ind.App.* 632, 291 *N.E.*2d 92, 105 n. 6 (1972) (stating, "Gross income is an improper measure. Plaintiff should not receive a windfall in the form of that portion of lost gross income representing expenses of operation saved by defendant's breach.").

We cannot determine from plaintiffs' gross receipts the losses they sustained because of the Township's cancellation of the lease. The subject clause requires the Township to pay damages of twenty-five percent of the lessee's average gross receipts for one year. Under the lease, average gross receipts are calculated by taking an average of the lessee's total gross receipts for three fiscal years immediately preceding the cancellation. So calculated, Jo–Ro's average yearly gross was $1,161,240.75. Twenty-five percent of this figure amounts to $290,310.18.

This amount, however, does not necessarily reflect plaintiffs' actual losses on considering operating expenses or relocation costs and other expenses attributable to defendant's breach. As reflected in Jo–Ro's income-tax returns, Jo–Ro earned a net profit of $3,649 in 1985, $414 in 1986, and sustained a loss of $323 in 1987. We recognize the difference between tax losses and actual losses. Yet, to the extent that tax returns reflect actual profit or loss, they demonstrate the unreasonableness of damages exceeding $290,000, which were calculated on the basis of gross receipts.

The decision whether a stipulated damages clause is enforceable is a question of law for the court. *218–220 Market St. Corp., supra,* 124 *N.J.L.* at 304, 11 *A.*2d 109; *Robinson v. Centenary Fund,* 68 *N.J.L.* 723, 725–26, 54 *A.* 416 (E. & A.1902). Although the question is one of law, it may require resolution of underlying factual issues. *Highgate Assocs., Ltd. v. Merryfield,* 157 *Vt.* 313, 597 *A.*2d 1280, 1282 (1991).

On balance, we believe we should remand this matter to the trial court to consider the reasonableness of the clause in light of this opinion. In resolving that issue, the court should consider, among other relevant considerations, the reasonableness of the use of gross receipts as the measure of damages no matter when the cancellation occurs; the significance of the award of damages based on twenty-five percent of one year's average gross receipts, rather than on some other basis such as total gross receipts computed for each year remaining under the lease; the reasoning of the parties that supported the calculation of the stipulated damages; the lessee's duty to mitigate damages; and the fair market rent and availability of replacement space. We leave to the sound discretion of the trial court the extent to which additional proof is necessary on the reasonableness of the clause. Because stipulated damages clauses are presumptively reasonable, *supra* at 252–53, 645 *A*.2d at 108, the burden of production and of persuasion rests on the Township.

To summarize, we affirm the judgment of the Appellate Division that the Township is liable to plaintiffs for terminating the lease. The agreement did not violate *N.J.S.A.* 40:60–42, and *N.J.S.A.* 40A:12–14 does not apply retroactively to the lease. We also affirm the judgment of the Appellate Division awarding plaintiffs damages of $55,748.27 for renovation costs. We remand to the Law Division the issue whether the clause requiring payment of stipulated damages based on the lessee's gross receipts is a valid liquidated damages clause.

The judgment of the Appellate Division is affirmed in part, reversed in part, and the matter is remanded to the Law Division.

For affirmance in part, reversal in part and remandment—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.