In re AMERICAN CHEMICAL
WORKS COMPANY, d/b/a
Baylis–American, Debtor.

American Chemical Works Company,
d/b/a Baylis–American, Plaintiff,

v.

International Nickel, Inc., Debtor.

Bankruptcy No. 94–11199.
Adversary No. 94–1177.

United States Bankruptcy Court,
D. Rhode Island.

June 1, 1999.

Allen P. Rubine, Winograd, Shine & Zacks, P.C., Providence, RI, for debtor/plaintiff.

Deming E. Sherman, Steven M. Kumins, Edwards & Angell, for defendant.

Sheryl Serreze, Assistant United States Trustee, Office of U.S. Trustee, Providence, RI.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

The Plaintiff/Debtor, American Chemical Works Company ("ACW"), complains and alleges that the Defendant, International Nickel, Inc. ("INCO"): (1) willfully violated the automatic stay § 362(h) by terminating its nickel distributorship agreement; (2) breached an implied covenant of good faith and fair dealing; and (3) breached the distributorship agreement by failing to renew the contract at year end 1994, and further acted in bad faith by failing to even consider renewal of the contract at year end 1994. For these alleged misdeeds, ACW seeks damages, pursuant to 11 U.S.C. § 362(h), in the amount of $1,945,278. The threshold issue is whether ACW, a corporate debtor, qualifies for relief under § 362(h), or whether the remedy provided therein is limited to natural persons. Additional issues are: (1) whether ACW has established its entitlement to an award of compensatory damages; and (2) whether INCO committed a criminal contempt which would expose it to liability for an award of punitive damages.

Upon consideration of the entire record, we resolve all issues of fact and law

against ACW, and in favor of INCO. More specifically, based upon the evidence presented and the applicable law, we find and conclude: (1) that, as a corporate debtor, ACW is not entitled to relief under 11 U.S.C. § 362(h); (2) that on the merits ACW has failed to prove *any* of its various damage claims with a reasonable degree of certainty, and therefore make no award for breach of contract and/or breach of implied covenant of good faith; and (3) as to ACW's claim for punitive damages under Section 105 there is no credible evidence or basis to support the claim.

## BACKGROUND

Except for the § 362(h) issue this dispute is fact driven—hence the following extensive discussion of the record. For many years ACW's president, Bruce Holland, tried to become an INCO distributor, and finally in April 1990 his persistence paid off and the first of five electroplating product distributorship contracts was signed, giving ACW a non-exclusive right to distribute INCO nickel. Each contract had a termination date of December 31, all were cancelable without cause upon sixty days notice, and there was no provision in any of the agreements for renewal or extension. Under the agreements, ACW was required to purchase a minimum of 500,000 pounds of nickel from INCO during the one year contract period,[1] and to provide monthly reports to INCO of its sales activity, including the names of customers, product, and quantities of materials sold. In the first *four* agreements ACW was required to post standby irrevocable letters of credit, but in the fifth agreement, for calendar year 1994, Holland asked that the terms be changed, i.e., to avoid the cost of a letter of credit, Holland asked INCO if it would accept payment by wire transfer, prior to shipment of the goods. INCO agreed to the modification.

---

1. The first agreement dated April 24, 1990, had a minimum purchase requirement of 330,000 pounds of nickel. That contract was not for a full year, however, and was prorated based on annual purchases of 500,000 pounds.

On November 5, 1993, a fire caused extensive damage to ACW's New Hampshire warehouse, and although the fire had no physical effect on its Providence operation, since no product was stored in the warehouse, ACW's insurance carrier declined to pay the resulting environmental clean-up costs. Six months later, in May 1994, with over $1 million in fire/environmental related debt, and a hotly contested claim for loss coverage, ACW filed for protection under Chapter 11. Being aware of these problems, as well as ACW's declining nickel sales, INCO became increasingly concerned that ACW would not be able to meet its minimum purchase quota. During this period Bruce Holland was in frequent contact with INCO District Sales Manager Michael Kleczka about these matters.

On or about May 28, 1994, Kleczka visited Bruce Holland in Rhode Island to discuss the continuing decline in sales, and to introduce him to Paul G. Houston, Kleczka's replacement as INCO's District Sales Manager. When Kleczka and Houston arrived at ACW they were dismayed to see the premises in serious disarray. As Kleczka described the situation: "The Providence office was almost empty.... It did not seem like an ongoing business.... The phone rang and no one answered it.... It was a shell of the former company ... not the same company, compared to past visits ." Paul Houston, to say it mildly, was very put off by what he also saw as a lack of attention and poor business manners by Bruce Holland, particularly since ACW, for a number of reasons, was already in rather deep trouble with its distributor.

During this same visit to Providence, Kleczka and Houston also met with Robert McIntyre of Roberts Chemical Company to discuss a distributorship with Roberts.

On June 29, 1994, one month after his visit to ACW, Houston telephoned and also wrote to Bruce Holland to inform him that INCO was terminating their contractual relationship "as soon as possible, and in any event by Monday, August 3, 1994." See Exhibit 7. Houston offered to sell ACW a one month supply of nickel at a fixed price, cash in advance, and ACW declined the offer. On the same date, INCO entered into a distributorship contract with Roberts Chemical Company. On August 4, 1994, ACW filed the instant adversary proceeding against INCO seeking a temporary restraining order and damages for violation of the automatic stay. In court, the parties quickly reached an agreement on the stay violation issue and on August 16, 1994, an order entered requiring INCO to reinstate ACW as a distributor through December 31, 1994, under the terms and conditions in the Distributor Contract. INCO also agreed to provide a letter acknowledging that the distributorship agreement was in force, and ACW was authorized to circulate the letter to its customers. Also part of ACW's claim is that INCO failed to live up to the terms of the consent order by delaying shipments and not providing the level of support it had in the past.

### LIABILITY DISCUSSION

■ Section 362(h) provides:

(h) An *individual* injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(h) (emphasis added). "Individual" is not defined in the Code, and there is a split of authority as to whether the term is limited to natural persons, or whether it includes corporations. *Compare Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 920 F.2d 183 (2nd Cir.1990), and *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.),* 108 F.3d 881, 884–85 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 364, 139 L.Ed.2d 283 (1997), and *Jove Eng'g, Inc. v. I.R.S.,* 92 F.3d 1539 (11th Cir.1996) and *Johnston Envtl. Corp. v. Knight (In re Goodman),*

991 F.2d 613, 619 (9th Cir.1993), *with In re Atlantic Bus. & Community Corp.*, 901 F.2d 325, 329 (3d Cir.1990) and *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 292 (4th Cir.1986). We agree with the majority view, wherein the cases hold that the section does not include corporations, and interpret "individual" to mean natural persons only.

In what is generally considered the leading case on the subject, the Court in *Chateaugay* said:

> Although the code does not define "individual," it does define "person" in § 101(35) to include "individual, partnership, and corporation...." Throughout the code, rights and duties are allocated in some instances to "individuals" and in others to "persons." Section 109, "Who may be a debtor," uses "person" in certain situations and "individual" in others. Chapter 13 of the code is available only to an "individual with regular income ... or an individual with regular income and such individual's spouse...." 11 U.S.C. § 109(e). The text of other code sections demonstrates that Congress used the word "individual" rather than "person" to mean a natural person. To cite but one additional example, § 101(39) defines "relative" as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." Plainly, the statute here is referring only to human beings; corporations and other legal entities can have no such "affinity or consanguinity" or "step ... relationship" except in the metaphoric sense, and can in no sense have an "adoptive relationship."

920 F.2d at 184–85. The Court also noted that Section 362(h) was added to the Code "as part of Title III, Subtitle A, Sec. 304 of Public Law 98–353, entitled 'Consumer Credit Amendments,' which contains numerous amendments relating only to 'individuals.'" *Id.* at 186. Restricting the term "individual" to natural persons comports with the plain meaning of the statute and does not appear to be illogical or inconsistent with any other provision of the Code.[2]

As a fall back argument to its request for compensatory and punitive damages under § 362(h), ACW suggests that it can be awarded an equivalent amount of damages in the form of a "civil contempt remedy," based on § 105(a) which states: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Some courts have found that civil contempt proceedings are available to corporate entities as redress for violations of the automatic stay. *See Chateaugay*, 920 F.2d at 187. In discussing a bankruptcy court's contempt powers, the First Circuit has stated:

> It is well-settled law that bankruptcy courts are vested with contempt power.... Bankruptcy rule 9020(b) specifically provides that a bankruptcy court may issue an order of contempt if proper notice of the procedures are given.

> In deciding whether a proceeding before a lower court involves civil or criminal contempt, we are required to look to the purpose and character of the sanctions imposed, rather than to the label given to the proceeding by the court below....

> Sanctions in a civil contempt proceeding are employed to coerce the defendant into compliance with the court's order *or, where appropriate, to compensate the harmed party for losses sustained* .... These sanctions are not punitive, but purely remedial.

*Eck v. Dodge Chemical Co. (In re Power Recovery Sys., Inc.)*, 950 F.2d 798, 802 (1st Cir.1991) (emphasis added). Furthermore, "a complainant must prove civil contempt

---

**2.** In the event this Court has unwittingly included corporations within the category of "individuals" in the past, visa-vis Section 362(h), those rulings are, *sua sponte*, hereby overruled.

by clear and convincing evidence." *Langton v. Johnston*, 928 F.2d 1206, 1220 (1st Cir.1991).

In seeking both compensatory and punitive damages under Section 105(a), ACW by definition is requesting the imposition of criminal contempt sanctions, which "are punitive in their nature and are imposed for the purpose of vindicating the authority of the court.... The contemnor in a criminal contempt case is entitled to a hearing, proof beyond a reasonable doubt and all the protections afforded those accused of a crime." *Power Recovery Sys.*, 950 F.2d at 802, n. 18 (citations omitted). Even if ACW had met the higher burden of proof as to liability in establishing civil contempt (i.e., by clear and convincing evidence) and criminal contempt (by proof beyond a reasonable doubt),[3] ACW has failed to establish its entitlement to damages, no matter what standard of proof is applied.

### DAMAGES DISCUSSION

The ACW/INCO distributorship agreement provides for the application of New Jersey law. See Exhibit 5, page 4, ¶ 16. Generally, under New Jersey common law a breaching party is liable "for all of the natural and probable consequences of the breach of that contract." *Pickett v. Lloyd's*, 131 N.J. 457, 621 A.2d 445, 454 (1993). "Compensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised.'" *525 Main Street Corp. v. Eagle Roofing Co.*, 34 N.J. 251, 168 A.2d 33, 34 (1961) *quoting* 5 Corbin, Contracts § 992, p. 5 (1951). "Implicit in these principles is some notion of foreseeability." *Pickett*, 621 A.2d at 454; *see also T.M. Long Co., Inc. v. Jarrett*, 165 N.J.Super. 117, 397 A.2d 735 (1979) (Ordinarily, one who breaches a contract is liable only for such damages as are reasonably foreseeable at

the time the contract was entered into); *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854) (holding that damages recoverable for a breach of contract are only those that may "reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it").

Here since the agreement involved the sale of goods, the relationship of the parties and the damages sought by ACW are covered by the Uniform Commercial Code, as adopted by New Jersey. *See Custom Communications Eng'g, Inc. v. E.F. Johnson Co.*, 269 N.J.Super. 531, 636 A.2d 80, 83–84 (1993) (finding that a distributorship agreement was a sale of goods contract under the UCC); *See also* N.J.Stat.Ann. § 12A:2–102 (The UCC applies to "transactions in goods"). Under the UCC, a buyer may "cover by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." N.J.Stat.Ann. § 12A:2–712(1). The buyer of goods may also "recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (12A:2–715), but less expenses saved in consequence of the seller's breach." N.J.Stat.Ann. § 12A:2–712 (2). It has also been held that lost profits are the proper measure of damages for breach of a distributorship agreement. *See Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 975 F.Supp. 681, 691–92 (D.N.J. 1997). Under both New Jersey law and First Circuit precedent, damages must be proved with a reasonable degree of certainty. *First Nat'l Bank v. Jefferson Mortgage Co.*, 576 F.2d 479, 494–95 (3d Cir.1978) ("the precise amount need not be shown with mathematical precision so long as the court can arrive at an intelligent estimate without speculation or conjec-

---

**3.** So the record is clear, ACW has not come close to establishing that INCO committed a contempt under § 105.

ture"); *Ondine Shipping Corp. v. Cataldo*, 24 F.3d 353, 357 (1st Cir.1994), *quoting Reliance Steel Prods. Co. v. National Fire Ins. Co.*, 880 F.2d 575, 578 (1st Cir.1989) ("Courts have repeatedly warned litigants that damages 'must be computed in some rational way upon a firm factual base' ").

Here, ACW has departed from the accepted method(s) of proving damages, and engaged in a hyperactive exercise in arithmetic to arrive at damage figures that bear no reasonable relationship with the proof. In this regard, ACW argues that in terminating the agreement in June 1994, and by its refusal to consider renewal of the agreement in December 1994, INCO was motivated solely and improperly by ACW's Chapter 11 filing. ACW also argues that its entitlement to damages should extend beyond the contract term of December 31, 1994 through June 30, 1997, because it had a reasonable expectation, based upon the parties' prior four year course of conduct, that INCO would *consider* renewal of the distribution agreement, and that it would in fact continue to renew the agreement. INCO's alleged refusal to consider renewal of the agreement violates an implied covenant of good faith and fair dealing. ACW also contends that INCO breached the covenant of good faith and fair dealing by failing to abide by the parties' prior course of conduct after the Agreement was reinstated in August 1994. Specifically, ACW alleges that after the reinstatement INCO failed to give special pricing or to accompany ACW people on sales calls to its customers, and that INCO delayed shipments and refused to allow ACW to book orders against unshipped nickel. We address each of these allegations as follows:

■ Under New Jersey law "every contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 690 A.2d 575, 587 (1997).

In every contract there is an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing."

*Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 207 A.2d 522, 531 (N.J.1965), *quoting* 5 Williston on Contracts § 670, pp. 159–160 (3d ed.1961); *Sons of Thunder*, 690 A.2d at 587. ACW relies heavily on *Sons of Thunder* to support its position that INCO breached the covenant of good faith and fair dealing, and for the premise that the obligation to perform in good faith exists even where, as here, the contract contains express and unambiguous provisions allowing either party to terminate the contract without cause. But ACW's fate here is not governed by what *Sons of Thunder* says—its problem is with its own performance under the contract, its environmental and non-fire-related financial and declining sales problems, and the evidence and the facts in this case, generally. Simply, but importantly, the facts in *Sons of Thunder*, vis-a-vis the conduct of the parties, are so vastly different from those in the instant case that it has no value as precedent.

In *Sons of Thunder* the purchaser induced the supplier to spend hundreds of thousands of dollars to rig boats and to purchase new equipment to harvest clams to sell to the purchaser, 690 A.2d at 576–579, under a one-year contract which was automatically renewable for up to five years. *Id.* at 577–78. The purchaser helped the supplier to obtain financing by assuring lenders that the contract would run for the full five years. *Id.* at 578. After the supplier had expended enormous resources on the venture, the purchaser unexpectedly *and without cause* issued a notice of termination. *Id.* at 580. The New Jersey Supreme Court held that the purchaser breached the implied covenant of good faith and fair dealing by continually failing to meet its minimum purchase requirements per the contract, *id.* at 589, and by imposing new terms that were completely unfavorable to the supplier.

*Id.* The conduct of the purchaser was found to be egregious and the court ruled that its actions destroyed the supplier's "reasonable expectations and right to receive the fruits of the contract." *Id.*

INCO's conduct doesn't remotely resemble the conduct of the purchaser in *Sons of Thunder.* INCO readily acknowledges that it acted improperly in terminating ACW's distributorship without first obtaining relief from stay, as evidenced by its capitulation at the inception of this action, but the termination lasted, at most, for forty-nine days.[4] By its terms, the subject Agreement ended "on the 31st day of December, 1994," see Exhibit 5, p. 3, ¶ 9, with no provision or even the suggestion of an enforceable right of renewal.

Here there is no evidence that INCO refused to renew the agreement solely because of ACW's Chapter 11 filing. To the contrary, the record contains many reasons that support INCO's failure to renew. The evidence is that ACW's sales were declining, and that although ACW was one of INCO's larger distributors, it was also the worst provider of the monthly reports required to be furnished by INCO distributors, see Exhibit 5, p. 1, ¶ 3, and that getting sales information from ACW was a "real push and pull." ACW was often at least two months in arrears reporting, and often used coded customer information which then had to be deciphered by INCO. According to INCO these were not minor shortcomings—this information was crucial to knowing whether customers were going to other distributors or to the major competition, Falconbridge Nickel. Additionally, the condition and disarray at ACW during the May 1994 visit was an important factor in INCO's decision. A significant reason for the May visit was to introduce Bruce Holland to Paul Houston, INCO's new District Sales Manager. Houston, who clearly had a different management style than his predecessor Kleczka, complained that the meeting lasted less than half an hour, and that

he learned nothing about ACW except that he didn't like anything he saw, including Bruce Holland. He pointed out that the issue of ACW's declining sales was not even mentioned, and that "nickel was not on Bruce Holland's mind" that day. It was obvious from the outset that Messrs. Holland and Houston were not going to hit it off, and this truly manifested itself during the telephone conversation when Houston informed Holland that the Distributorship Agreement was being canceled. With that news, Holland erupted in a personal attack on Houston, shouting: "you little shit, I'd have to check my brains at the door to even talk to you," "I'll bring the power of my family down on you," and other words of similar import. Houston stated that the discussion "rocked him," and he was convinced then and there that he wanted no further dealings with ACW or Holland. Whether the business relationship could have been salvaged by a different public relations approach on Holland's part is a question we need not answer. The fact is that in addition to the other market and business related problems mentioned above, the finishing touch to the non-renewal of this already troubled distributorship was assured and virtually self-inflicted by Bruce Holland. Under the circumstances of this case there is absolutely no basis for a finding that INCO acted inequitably or willfully in failing to renew the distributorship agreement with ACW. To the contrary, the record is full of evidence to support INCO'S decision. By the unambiguous written agreement of the parties, neither ACW nor INCO was obligated to renew this non-exclusive agreement, INCO was free to change distributors at its option, and ACW's assertion that INCO did not even "consider" renewal of the distributorship agreement is not supported by the evidence. Given the travel detailed above, Houston considered and determined shortly after the May 1994 visit with Holland that renewal was not a reasonable business

4. The Contract was terminated on June 29, 1994 and reinstated on August 16, 1994.

option. ACW also argues that the parties' course of dealing over a four year period in renewing the distributorship agreement required INCO to consider renewal[5] of the Agreement at the end of 1994, and that INCO was obligated to renegotiate the distributorship agreement, consistent with the parties' historical dealings. Nothing in the record supports ACW's alleged entitlement to such broad equitable treatment, considering its failing performance and various other shortcomings. For example, ACW's nickel sales had been declining since 1993, it had not provided its customer lists for all of 1994, and generally was not meeting the standards required by INCO of its distributors. Additionally, while INCO's prior management may have been less aggressive in dealing with substandard distributorships, Houston's appearance as INCO's new Distribution Sales Manager clearly changed things, and the fact that Bruce Holland completely failed to perceive or appreciate the change does nothing to improve his position. ACW's arguments might carry more weight if circumstances remained stable during the parties' relationship, but that is not what happened. ACW's overall performance as a distributor steadily deteriorated throughout the relevant time, beyond the general market slump, and this also contributed to INCO'S decision not to renew the agreement.

Furthermore, under New Jersey law:

The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; *but when such construction is unreasonable, express terms shall control course of performance* and course of performance shall control both course of dealing and usage of trade.

N.J.Stat.Ann. 12A:2–208(2) (emphasis added). The Agreement in question ended on December 31, 1994, and there is no provision for renewal. No reasonable construction can reconcile the express terms of the agreement with the interpretation ACW seeks to engraft upon it, based on the conduct of these parties. While its past conduct vis-a-vis ACW (and even its other distributors) may have indicated that INCO normally renewed distributorships, its standard agreement expressly gives either party the right to terminate, even without cause. In the absence of bad faith, which we find does not exist here, the contract terms control over a prior course of dealing. *See* N.J.Stat.Ann. 12A:2–208(2); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 135–36 (5th Cir.) *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) (finding that express contract term allowing for arbitrary termination of distributorship agreement upon ten days notice controlled over allegedly conflicting course of dealing); *Paulson, Inc. v. Bromar, Inc.,* 775 F.Supp. 1329, 1334 (D.Haw.1991) (where the court refused to impose a "non-renewable only for cause" provision in a distributorship agreement, based on a course of dealing between the parties, saying "any communications or other events which occurred in the course of performance do not, as a matter of law, alter the plain meaning of the contract."); *Blalock Machinery & Equip. Co., Inc. v. Iowa Mfg. Co.,* 576 F.Supp. 774, 779 (N.D.Ga.1983) (The parties enjoyed a twenty-seven year business relationship and the distributorship agreement provided that either party could terminate the agreement without cause upon thirty days notice. The court found that while the parties may have created a reasonable expectation in each other that neither would terminate the distributorship contract without cause, the "express contract terms must control over any conflicting course of dealing or course of performance"). Here, in a much weaker case than *Blalock,* the conduct of the

---

**5.** On this issue there is no competent evidence that INCO failed to consider renewal. In fact, there is ample evidence that INCO indeed considered the question, and in the circumstances exercised reasonable business judgment in not renewing.

parties provides absolutely no basis upon which to alter the express terms of the contract.

■ Having thus concluded that ACW, at best, would be entitled to damages only through the contract term—December 31, 1994, we will address the proof in the five categories of claimed damages on that basis:

## (1) Lost Gross Profits on Nickel Sales Made by Roberts Chemical:

On July 1, 1994, INCO entered into a distributorship contract with Roberts Chemical Company ("Roberts") in Providence, Rhode Island, and this act coincided with the termination of ACW as an INCO nickel distributor. Feeling that the greater Providence marketplace would not support two distributors, it was INCO's intention to replace ACW with Roberts as its Providence distributor, so when INCO reinstated the ACW contract under the Order of August 16, 1994, it left Roberts in place as its long-term nickel distributor in Rhode Island.[6] ACW now contends that every sale of nickel made by Roberts from July 1, 1994 through December 31, 1994[7] to a former ACW customer is a sale that would have been made by ACW, but for INCO's wrongful termination of the distributorship agreement. To prove this, ACW identified all of the customers to whom it sold INCO nickel between January 1, 1993 and June 30, 1994, and compared that list to Roberts' actual sales of INCO nickel for the period July 1, 1994 through December 31, 1994. If a customer's name appeared on both lists, ACW counted that as a lost sale. ACW's accountants then calculated ACW's average *gross* profit on INCO nickel sales in the twelve months preceding the Chapter 11 filing, and determined that to be 9.684%. They then applied this number to the sales made by Roberts to former ACW customers during the period July 1, 1994 – December 31, 1994, and calculated the damages in this category to be $42,661. See Exhibit 35.

For this methodology to carry the day, the underlying support would need to be much more persuasive than what we have here. To begin with, there is no basis for the assumption that all Roberts' sales during the period in question would have been ACW sales. Second, even if all Roberts' sales could be counted as lost ACW sales, ACW uses gross, rather than net profit in its calculations. ACW's accountants, Jerome Lefkowitz and James Martin, define gross profit as the sale price of nickel, minus the cost of goods sold. Martin said they did not calculate ACW's net profits on nickel sales because its costs were "almost fixed." For example, he assumed based on what Bruce Holland told him that since customers were purchasing more than just nickel from ACW, ACW's trucks would be going to the customer anyway. According to Holland, there is a "tie-in relationship" between the sale of nickel and other chemicals used in the plating industry; these related chemicals are manufactured by various producers and are patented formulas referred to as proprietary chemicals, or brighteners and cleaners; and that nickel is a loss leader which is sold at low profit margins, but which is carried in order to obtain the propriety chemical business which generates much higher profits. To validate this tie-in theory ACW called Tom Connor, the plant manager of an ACW customer, Rhode Island Buckle Company. However, Connor testified unequivocally

---

6. It should be kept in mind that under the ACW distributorship agreement there was no prohibition to adding distributors, and ACW did not have an exclusive right to sell INCO nickel in the Providence marketplace. In fact, according to Kleczka, none of INCO's distributors are given exclusive rights or territory, nor are they prohibited from selling in any other territory.

7. ACW actually seeks damages in this category through June 30, 1997. However, we have ruled out extending damages beyond the contract term at issue, i.e., December 31, 1994. See Damages Discussion, *supra* at 221–25.

on cross examination that there was no tie-in between nickel and other chemicals, and that quality was the primary factor in purchasing proprietary chemicals for plating baths, while price and sharp competition drove nickel sales. On redirect examination Connor recanted a bit, but his testimony on this issue was very damaging to ACW's "tie-in" theory. ACW also called Michael Pfaff, an employee in MacDermid's Industrial Products Division. MacDermid produces proprietary chemicals which were distributed by ACW as early as 1983, well before it obtained an INCO distributorship. While he did state that ACW "could" put various items on one truck for delivery to a customer, his testimony was not supportive of the tie-in theory. In fact, Pfaff stated that MacDermid itself had purchased an INCO distributorship, Allied Kelite, and that he ended up establishing a separate division to deal with nickel sales, because it was such a low margin item. He also testified that when he adds a distributor to sell MacDermid proprietary chemicals he doesn't care what else the distributor sells, and that it also doesn't matter whether a new distributor sells INCO nickel. Finally, ACW called Robert DeAngelis, former co-owner and president of National Plating, in Providence, Rhode Island. DeAngelis also testified that he purchased chemicals from a variety of suppliers, and bought nickel based primarily on price and continuity of supply. This testimony also did little to support ACW's tie-in theory.

The evidence is that proprietary chemicals are patented, "secret" formulas which differ in quality from manufacturer to manufacturer, while nickel is a standard commodity that is price sensitive. This finding is supported by the testimony of Messrs. Connors and Pfaff, as well as Robert McInyre of Roberts Chemical, who testified that there is no link between nickel sales and other products, and that landing the INCO distributorship did not help Roberts' related chemical sales. Accordingly, I find that the "tie-in" assumed by ACW's accountants, which was the basis for their use of gross income figures to compute damages, is not supported by the evidence and that their opinions in that respect should be given no weight.

In using gross rather than net figures, ACW also impermissibly ignored many real life expenses of doing business, such as overhead, insurance, the cost to warehouse, carrying charges, and sales, as well as delivery expenses. *Wasserman's Inc. v. Township of Middletown,* 137 N.J. 238, 645 A.2d 100, 109–110 (1994) (gross profits are not the proper measure of damages for loss of business); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 735–36 (3d Cir.1991) *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). To award damages based on gross profits on assumed nickel sales would provide ACW with a large, unrealistic windfall, especially since the company never showed a net profit from 1992 through 1994. See Exhibits Y, Z, AA; *see also Wasserman's,* 645 A.2d at 110.

But there are many other factors that were either overlooked or ignored. ACW's accountants disregarded the generally declining nickel market throughout this period, that ACW nickel sales were likewise on a declining trend, that ACW was the debtor in a Chapter 11 case, which clearly did not enhance its business image or competitive position, and the chaotic condition and appearance of the premises in May 1994. Robert McIntyre testified that Roberts historically sold nickel at a 6.5% gross profit margin, significantly less than ACW's alleged 9.684%. Roberts' lower prices would probably account for at least some of ACW's alleged "lost" sales. That ACW's accountants failed to consider any of these factors seriously damages their underlying opinions.[8]

The quality of ACW's case is further eroded by evidence of faulty computer in-

---

**8.** If they did not disregard the declining sales, they made the unacceptable assumption that the decline was affecting everybody except ACW.

formation relied upon by ACW's accountants in figuring damages. James Martin conceded that ACW's Exhibits 17 and 18, which show sales data for given periods of time, are unreliable in that the column listing prior years' sales information for particular customers does not make mathematical or common sense. See Exhibits 17 & 18. For example, in response to questions regarding a sale of nickel to General Electric in 1994, Martin agreed that if it occurred as reported, the gross profit margin on the sale would have been 52%—something that just does not happen in the industry. Martin could not explain the discrepancy and, when thus confronted, only stated that he really did not rely on this specific information in calculating damages. This random but unexplained inconsistency degrades the integrity of ACW's records generally, and specifically the opinion evidence upon which said records were based. Given the accumulation of shortcomings in ACW's proof, with only mediocre explanations and inadequate disclaimers by its experts, we find that ACW has failed to prove its damages in this category with a reasonable degree of certainty. See First Nat'l Bank, 576 F.2d at 494–95; Ondine Shipping Corp., 24 F.3d at 357.

### (2) Lost Gross Profits on Remaining Nickel Sales.

ACW asserts that after the termination of the distributorship, it continued to sell nickel in order to still provide "one stop shopping" for its customers, and that in doing so it was required to purchase nickel at higher prices during the period it was not an INCO distributor. ACW further complains that when it was reinstated forty-nine days later, it had to compete with Roberts Chemical. As a result, ACW's gross profit margin on nickel sales declined from 9.684% to 5.432%, and that the total damage in this category is $20,670 for

the period in question.[9] See Exhibit 35. As to these alleged damages ACW's methodology is again rejected, for many of the reasons discussed above. At the top of the list, ACW again does its arithmetic based on gross profits, without a reasonable or acceptable explanation.[10] ACW also failed to account for or even comment upon the declining nickel market and the considerable competition already in the nickel business, even before Roberts was added as an INCO distributor. Robert McIntyre testified that there were eight competitors, including ACW, in the local marketplace, that Roberts was often forced to lower its margin in order to make sales, and that sometimes a sale would be lost to a competitor for a de minimus difference in price. Such competition in a declining market would have a negative effect on even a healthy company's gross profit margin. In the circumstances, there is no basis for a finding that any of the decrease in ACW's gross profit margin was caused by the termination of the distributorship, let alone all of it. For these reasons, ACW has failed to prove its damages in this category with a reasonable degree of certainty. See First Nat'l Bank, 576 F.2d at 494–95; Ondine Shipping Corp., 24 F.3d at 357.

### (3) Lost Gross Profits on Non–Nickel Plating Related Chemical Sales.

This part of ACW's claim is entirely dependent on its tie-in theory between nickel and other non-nickel related chemicals. ACW calculated the INCO nickel customers it (claims were) lost to Roberts Chemical in Category 1 (discussed supra at 224–227), then added the loss in non-nickel plating chemical sales to these customers for the period in question.[11] It then multiplied the decline in related chemical sales by its historical gross profit margin on these products—24%. The claimed damages in this category total

---

9. See footnote 7 at 225, *supra.*

10. Since ACW never showed a net profit for 1992 through 1994, this track record is very

likely another reason why it has opted to deal only in gross numbers.

11. See footnote 7 at 225, *supra.*

$43,234. See Exhibit 35. We have found, *supra* at 21–23, that the alleged tie-in between nickel and other products does not exist, and this itself requires denial of these damages, as too speculative. But ACW also failed to consider any external reasons for the decline in its proprietary chemical sales, such as the Chapter 11 filing, the problems resulting from the New Hampshire fire, and the "disarray" in Providence.[12] Also damaging to its position is ACW's failure to adequately explain the decline in sales even after the distributorship agreement was reinstated. Although it was an INCO distributor from August 16 through December 31, 1994, ACW still claims a loss of related chemical sales for this period. If it were objectively attempting to accurately estimate its damages, ACW would have compared Roberts' related chemical sales, to determine whether those sales increased to Roberts' INCO nickel customers. ACW did not do this, probably with reason, since the evidence is that Roberts' sales of other products did not increase after it became an INCO distributor. And again, ACW's claim is for gross rather than net profits, an approach we have consistently rejected here. For these reasons, ACW has failed to prove its damages in this category with a reasonable degree of certainty. *See First Nat'l Bank*, 576 F.2d at 494–95; *Ondine Shipping Corp.*, 24 F.3d at 357.

### (4) Lost Gross Profit on Non–Nickel Plating Related Chemical Sales in Connecticut.

ACW, the sole distributor of MacDermid proprietary chemicals to the New England plating industry from 1983 through June 1994, claims that concurrent with the termination of the Distributorship Agreement by INCO, MacDermid added another distributor in the Connecticut market, Gilbert & Jones, to sell its proprietary chemicals,

and that Gilbert & Jones' sales of proprietary chemicals in the Connecticut area grew dramatically, while ACW's sales of similar product decreased. ACW examined its sales to its Connecticut customers for the period July 1, 1993 to December 31, 1993, and compared those to sales made to the same customers for the period July 1, 1994 through December 31, 1994.[13] ACW calculated its lost net sales and multiplied that figure by its historical *gross* profit margin on proprietary chemical sales, 24%, to come up with lost *gross* profits of $29,564 for the period July 1, 1994 through December 31, 1994. See Exhibit 35.

This analysis suffers from many of the same flaws discussed above: (1) these damages are dependent on the establishment of a tie-in relationship between nickel and proprietary chemicals, which we have found does not exist; (2) ACW talks only in terms of gross (rather than net) profits; and (3) ACW's accountants failed to consider any of the often-referenced "other factors" for the decline in sales.

Furthermore, Michael Pfaff of MacDermid testified that after his May 12, 1994 meeting when Bruce Holland informed him of ACW's Chapter 11 filing, he became concerned and started to monitor the ACW situation more closely. He acknowledged that when INCO terminated the distributorship ACW would have a harder time competing, and added that ACW "had a major headache with the fire and clean up," and that MacDermid needed a contingency plan. He also stated that MacDermid for some time had been contemplating expanding its distributorship in Eastern Connecticut, and it was for these reasons that MacDermid added Gilbert & Jones as a distributor. The evidence consistently (and quite logically) indicates that all of the participants in the New England nickel

---

12. Given the condition of the Providence premises as described by Houston and Klezcka, plus the fire that created a new liability of over $1 million, ACW's viability had to be of concern to all of its customers.

13. ACW claims damages all the way through June 30, 1997. However, we have ruled out extending damages beyond the contract term. See footnote 7 at 225, *supra*.

plating industry, including INCO, were competing in business as usual, at arms' length, with only ACW claiming some mysterious proprietary right to all customers with whom it had ever done business. In the abstract this contention is specious and untenable, and it remains so when viewed in light of the evidence.

Even putting aside all of these problems however, there are further inconsistencies with the proof in this category. Of the thirty-six ACW Connecticut customers involved, ten purchased more MacDermid proprietary chemicals from ACW after the termination than prior thereto. See Exhibit 35. When confronted with this anomaly, ACW's accountants simply state that in determining the net effect of the termination they did take these increases into account. While its experts choose to emphasize just one aspect of the data, i.e., the net decrease in sales, common sense dictates that where over 27% of ACW's customers purchased more MacDermid product after Gilbert & Jones was added as a distributor, the data upon which the damage claim is based becomes as unreliable as the methodology used. For these reasons also, I find that ACW has failed to prove its damages in this category with a reasonable degree of certainty. *See First Nat'l Bank,* 576 F.2d at 494–95; *Ondine Shipping Corp.,* 24 F.3d at 357.

### (5) Lost Gross Profit on Sales to MacDermid, Inc.

ACW and MacDermid had another relationship. Starting in 1987 or 1988, MacDermid purchased most of its commodity chemicals[14] from ACW. This relationship had nothing to do with nickel, and it existed long before ACW became an INCO nickel distributor. ACW contends that MacDermid became concerned about the security of its commodity chemical supply after INCO terminated the nickel distributorship, and as a result began to purchase commodity chemicals from other suppliers. ACW compared its sales of chemicals to MacDermid from the pre-termination period, June 30, 1993 to December 31, 1993, to the period after the termination June 30, 1994 to December 31, 1994,[15] claiming that it lost $808,631 in sales to MacDermid for the period. ACW multiplied its historical gross profit margin on sales to MacDermid, 10.7%, to come up with $86,524 in damages for the period.

The evidence is that MacDermid's concern over ACW's viability was not caused by INCO's termination of the distributorship, but rather, because of ACW's failing condition generally, including the fact that it was a Chapter 11 debtor. Pfaff's testimony is reasonable, it is believable, and it is accepted that after the Chapter 11 filing MacDermid became concerned, and it was then that they decided to begin watching things more closely. He also recognized, as any reasonable business person would, that ACW "had a major headache with the fire and clean up," that MacDermid needed a contingency plan, and that ACW's Chapter 11 filing was a significant cause of MacDermid's trepidation. Furthermore, this commodity chemicals relationship with MacDermid, which had nothing to do with nickel, existed prior to ACW's relationship with INCO, and it existed after the INCO relationship ended.[16] In the spectrum of proof of speculative damages, the claim in this category is off the scale. *See First Nat'l Bank,* 576 F.2d at 494–95; *Ondine Shipping Corp.,* 24 F.3d at 357.

Two final points need to be addressed: ACW claims that INCO breached the covenant of good faith and fair dealing by failing to abide by the parties' prior course of conduct *after* the Agreement was reinstated in August 1994. While we believe our discussion at pages 222–225, *supra,* is

14. Commodity chemicals are the raw ingredients used to make proprietary chemicals.

15. See footnote 7 at 225, *supra.*

16. In fact the evidence is that sales to MacDermid increased beginning in 1995 and in subsequent years, long after the INCO relationship ended, and after ACW emerged from Chapter 11.

dispositive of this point, ACW has provided no competent evidence on the issue. The only evidence ACW offered was by Bruce Holland, who stated that after the reinstatement, communications with INCO broke down, he could not book new orders against nickel that was not yet shipped, shipments were intentionally delayed by INCO, and INCO refused to provide favored pricing. In contradiction of Holland's evidence, Paul Houston testified, credibly in our view, that INCO obeyed the consent order and abided by its terms. Holland's testimony was biased and unreliable on this issue and in contested areas generally, and is accorded little weight;

Regarding the alleged consequences of INCO's violation of the automatic stay, ACW has failed to provide any reasonable basis upon which to award the damages requested. While ACW may have been entitled to an award of *compensatory* damages [17] for INCO's admitted transgression, we may not engage in the kind of speculation that would be necessary to make an award. ACW has rolled the dice and lost, in an all or nothing attempt to place a high damage figure in the record, and in doing so has foreclosed the possibility of a compromise award.[18]

### CONCLUSION

This case is very reminiscent of another dispute which began in this Court and ended in the First Circuit Court of Appeals. In addressing the plaintiff's unorthodox method of proving damages, the court stated:

Here, plaintiff—for whatever reason—seemingly made a conscious choice to bypass the accepted way of proving damages and to vie for a much larger prize. That endeavor having capsized, it is fitting that plaintiff bear the readily foreseeable consequences. We do not think that justice miscarries when a court rebuffs a suitor's efforts to obtain clearly excessive damages on an insupportable legal theory and leaves the suitor holding an empty (or near-empty) bag. *Cf. Quinones–Pacheco v. American Airlines, Inc.,* 979 F.2d 1, 6 (1st Cir.1992) (upholding take-nothing verdict when plaintiffs failed to prove their damages). Overreaching, like virtue, is often its own reward.

*Ondine Shipping Corp.,* 24 F.3d at 356. As did the plaintiff in *Ondine Shipping,* ACW shot for the stars while failing to provide a proper foundation to support its monumental claim. For all of the reasons discussed, ACW' Complaint is DENIED and DISMISSED

Enter Judgment consistent with this opinion.

---

**17.** We say *compensatory* because ACW would not have met the enhanced burden of proof of beyond a *reasonable doubt* for criminal contempt sanctions. Additionally, there was never any notice to INCO that criminal contempt sanctions would be at issue. *Power Recovery Sys.,* 950 F.2d at 802 n. 18. In fact the word "contempt" was not mentioned by ACW until its post-trial brief, when it first realized that damages under § 362(h) might not be available to corporate debtors.

**18.** In the event our ruling regarding ACW's lack of proof on the issue of contempt is reversed on appeal and remanded, based on the record we would find that ACW's legal expense incurred in getting the Distributorship Agreement reinstated is the only damage item that can be quantified, without engaging in improper speculation. Based upon its Exhibit 43, we find that ACW's legal expenses incurred from June 29, 1994 through August 16, 1994, and attributable to the reinstatement, would be compensable as actual damages. These fees total $8,286.