DECISION
It has been said that "a bad neighbor is as great a calamity as a good one is a great advantage." The relationship between the Plaintiff, George Caramiciu and his neighbors, Defendants, Nicholas Rossi and Wendy Richards, is nothing short of a great calamity.
This matter is before the Court on the motion of the Defendant, Wendy Richards, to adjudge Plaintiff, George Caramiciu, in contempt of a court order entered on June 21, 2001. The motion was heard in part on July 20, 2001 and was concluded on July 27, 2001.
To put this motion in perspective, the Court will review the travel of this litigation. On June 11, 2001, Plaintiff filed the instant case seeking injunctive relief against his neighbors. Among other allegations, Plaintiff asserted that Rossi, Richards and her children had moved into his quiet neighborhood and raised havoc in the community. He asserted that they have deprived his family of the peaceful and quiet enjoyment of their home and have stalked and intimidated them. Caramiciu, his wife and daughter sought a Temporary Restraining Order to preclude Defendants from having any contact with them.
A Temporary Restraining Order may be granted without notice to the Defendants, but such order must expire within ten days, unless after hearing, with notice to Defendants, the Court extends the order for an additional period of time. Super.R.Civ.P. 65. The Court assigned the case for hearing to June 21, 2001, with notice to Defendants, and on that day, Defendants appeared and denied Plaintiffs' allegations against them. They asserted that Plaintiff was harassing them.
The controversy appeared resolved when the parties agreed to enter into a mutual no-contact order, and on June 21, 2001, the Court issued a Preliminary Injunction enjoining the parties from any and all direct and indirect contact and restraining them from harassing, threatening, assaulting or harming one another. The order excluded only incidental, unintentional contact necessitated by the proximity of their neighboring homes. Each party, including Plaintiff, George D. Caramiciu, signed the order under a testimonium clause which states: "I have read this order, I understand it and have signed it on 6/21/01 willingly and as a result of my own free act and deed." The order entered.
The instant motion was filed by Defendant, Wendy Richards, on July 5, 2001. In her handwritten motion, Richards asserts that Caramiciu has harassed her family in violation of the restraining order. The motion along with Caramiciu's objection thereto came on for hearing on July 20, 2001. In addition to the allegations contained in Richards' written motion, both she and Rossi claimed that Caramiciu had engaged in a pattern of conduct to provoke them and to incite Rossi to violate the no-contact order. Again, the parties exchanged accusations and each complained about the other.
The Court notes that Mr. Caramiciu's demeanor when he appeared in Court on July 27, 2001 was entirely different than his demeanor on July 20, 2001. He was respectful and restrained on July 27, 2001. However, the Court cannot disregard Mr. Caramiciu's earlier appearance. I was unimpressed by Plaintiff, Caramiciu's attitude when he appeared in Court on July 20, 2001. He was disrespectful to the Court, and his sanctimonious, self-righteous manner did nothing to enhance his credibility. The Court notes with approval that Mr. Caramiciu has modified his behavior, and the Court will consider that fact in determining the amount of any sanction ordered against him. In contrast, Richards, Rossi and the teenagers who appeared here with them on July 20, 2001 were respectful and polite. Mr. Rossi was a credible witness when he testified on July 27, 2001.
Plaintiff, Caramiciu, produced a video tape and suggested that the Court should review it to more fully appreciate the situation. The Court played the videotape, and it has been marked as an Exhibit. It has been said that "a picture is worth a thousand words." In this case, the Court finds that four minutes and fifteen seconds of that videotape, recorded on July 4, 2001, speak far more loudly than the testimony of any witness in this case.
During the pertinent segment of the tape, Caramiciu had been driving his mini van in his neighborhood, a street or so away from his home. The Court finds that, as he drove, he observed Rossi, who was operating Richards' automobile with her children in the car. At some point, Rossi stopped in the road and was talking through the driver's window to a neighbor unrelated to this litigation. Caramiciu positioned his automobile in front of Rossi's. Caramiciu remained stopped in that location. His presence was clearly visible to Rossi. For over three and a half minutes, Rossi carried on a private conversation with a stranger to this controversy while Caramiciu videotaped him through his side view mirror. The Court finds that Caramiciu did this for no reason other than pure harassment. When Rossi ended his conversation with a handshake, he pulled around Caramiciu's vehicle. After Rossi appeared justifiably irritated with Caramiciu and spoke to him, Plaintiff responded in a gleeful tone: "gotcha." The Court finds that Caramiciu then assumed that he had succeeded in catching Rossi on tape violating the no-contact order. The Court disagrees, and finds that Caramiciu caught himself on tape violating the no-contact order and provoking a potentially dangerous situation that thankfully ended peacefully in Court. I incorporate those four minutes and fifteen seconds of the videotape by reference in this decision to further explain the basis of my ruling.
It is ironic that Plaintiff chose to violate Rossi's privacy on the two hundred and twenty-fifth anniversary of the day that the Second Continental Congress adopted the Declaration of Independence. Independence Day has been the primary American patriotic holiday ever since. On the 4th of July, we celebrate what our forefathers described as ". . . certain unalienable rights . . ." including "Life, Liberty and the pursuit of Happiness." U.S. Declaration of Independence. The act of stalking and interfering with another is contrary to the exercise of those rights, but most significantly, for purposes of this motion, it is in direct violation of Court order.
The Court cannot determine from the videotape the validity of Plaintiff's allegations against Richards and Rossi, and I make no finding as to who is the worse neighbor. However, the videotape illustrates a concerted effort on the part of George Caramiciu to provoke Rossi to violate the no-contact order entered against him. The videotape shows Caramiciu stalking and harassing Rossi and clearly ignoring and violating the Preliminary Injunction entered on June 21, 2001.
Plaintiff, George Caramiciu, has become obsessed with Rossi and Richards, and he has engaged in behavior that aggravates, rather than calms the turbulent situation in the neighborhood. He has demonstrated willful disobedience of the Court order entered on June 21, 2001. If continued, his course of conduct may well lead to violence. Beyond a reasonable doubt, I find George Caramiciu in contempt of Court.
Contempt of court can be either criminal or civil; criminal contempt is used to vindicate court's authority by punishing for past violation of court order, while civil contempt is used to coerce present or future compliance with court order. Sunbeam Corp. v. Black Decker (US), Inc., 151 F.R.D. 11 (D.R.I. 1993). Sanctions in a civil contempt proceeding are not punitive, but purely remedial. Criminal contempt sanctions are punitive in nature and are imposed for the purpose of vindicating the authority of the court. In re American Chemical Works Co., 235 B.R. 216
(Bkrpcy. D.R.I. 1999) Contempt is ordinarily civil or criminal in character; however, there are instances when it may partake of both characteristics. State v. Brant, 209 A.2d 455, 99 R.I. 583 (1965). The line between civil contempt and criminal contempt is often not clearly defined, and the two concepts may overlap. Ventures Management Co., Inc. v. Geruso, 434 A.2d 252 (R.I. 1981). The court has power to punish in a summary, but reasonable manner any willful act in defiance or disregard of its authority or in disobedience of its order. Criminal contempt involves an act which is committed against the authority and dignity of the court. Nelson v. Progressive Realty Corp., 81 R.I. 445 (1954). Both criminal and civil contempt may utilize imprisonment and monetary fines. Sunbeam Corp., 151 F.R.D. 11.
In this case, Plaintiff's contemptuous violation of the Preliminary Injunction has both civil and criminal aspects. The Court is greatly concerned with Plaintiff's total lack of regard for the authority and dignity of its orders. However, the Court is likewise concerned that the Plaintiff will not obey its orders without being coerced to do so. Accordingly, the Court finds the Plaintiff in civil contempt of the order of June 21, 2001, and will fine Plaintiff to coerce future compliance with court order. Where a party is found in civil contempt, the Court may exercise its discretion to require a reasonable but sufficient payment to be made to the Court to make the contemnor comply with its order. The Court considers the character and magnitude of the harm threatened, by continued contemptuous behavior and the probable effectiveness of a monetary sanction in bringing about the result desired. See Pawt. School Comm. v. Teachers Alliance,101 R.I. 243, 255 (1966).
For the foregoing reasons, the Court fines the Plaintiff five hundred ($500.00) dollars, payable to the Court by 3:00 P.M. this afternoon.
May this ruling serve as a warning, not only to Plaintiff, but to everyone involved in this litigation, that they should turn down the volume on this neighborhood dispute. Try to live in peace with one another and channel your energies toward a more worthwhile pursuit than making life miserable for each other. In the event that either side is brought back to court for allegedly violating the order of June 21, 2001, and the Court finds a violation, the contemnor will be dealt with harshly.