NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3073-17T1

FRANK HOLTHAM, JR.,

     Plaintiff-Appellant,

v.

KATHERINE LUCAS,

     Defendant-Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **July 10, 2019**
>
> **APPELLATE DIVISION**

Submitted December 19, 2018 – Decided July 10, 2019

Before Judges Ostrer, Currier and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-1695-14.

Ameri & Associates, LLC, attorneys for appellant (Nima Ameri, of counsel; John J. Clark, IV, on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

OSTRER, J.A.D.

According to well-settled contract law, a provision that stipulates an unreasonably large amount of damages for a future breach is an unenforceable

penalty. Invoking that "penalty rule," plaintiff-husband Frank Holtham, Jr., challenges a provision in his marital settlement agreement (MSA) that charged him a "per diem penalty of $150" for breach of any duty under the agreement. Holtham did not, as required, timely pay off a loan on an automobile that the MSA equitably distributed to his wife, defendant Katherine Lucas, and tender her title to the car. She sought relief, and the trial court ordered Holtham to pay $150 for each day of his noncompliance, totaling $18,450, plus attorney's fees. Holtham contends on appeal that $18,450 was not a permissible liquidated damage award but instead an unenforceable penalty.

We agree that $18,450 would constitute an unenforceable penalty under traditional contract law principles, which are founded on the premise that contracting parties are rational economic actors, and which limit damages to measurable compensable losses. The penalty rule is intended to avoid oppression, excessive recovery, and deterrence of efficient breach.

However, the penalty rule does not apply with equal force to marital settlement agreements embodied in final divorce judgments. A principal reason to enforce such agreements is to secure post-divorce harmony and stability. Enforcement of penalty provisions may appropriately deter post-divorce non-compliance that is not economically motivated, and it may compensate for the emotional harm resulting from such a breach. Although we

2

conclude the penalty rule does not govern divorce settlement agreements, we emphasize that the family court retains the inherent power to modify such provisions to assure fairness and equity. Since no modification is warranted under the circumstances of this case, we affirm the award.

I.

The parties divorced after five years of marriage. The judgment of divorce (JOD) incorporated the MSA, which the parties entered with their counsels' advice.[1] Without addressing the MSA's "merits," the JOD declared that "the parties entered into it freely and voluntarily, and that it is therefore binding and enforceable."

The MSA enforced the parties' prenuptial agreements and resolved several property and insurance-related matters. For example, the MSA required Holtham to pay Lucas $315,000 in two installments; authorized her to retain a Florida condominium and required him to lift a lis pendens; and required him to help Lucas obtain health insurance and to pay for it for two years. Relevant to this appeal, the MSA also provided that Lucas would retain exclusive use of the 2009 Mercedes she then possessed, and that Holtham would continue paying for the car's insurance and financing. Holtham was

---

[1] The handwritten MSA, entitled "Memorandum of Understanding," was signed by the parties and witnessed by their attorneys.

required to complete payment of the roughly $50,000 remaining of the auto loan by July 9, 2017, and then to transfer clear title.

Almost all the MSA's executory provisions, including the automobile provision, pertained to Holtham's actions. The MSA stated that if Holtham defaulted "in any obligations" in the MSA, Lucas would be entitled to reasonable counsel fees incurred to enforce, and "a per diem penalty of $150.00 for every day that husband fails to comply with this agreement." The MSA included a mutual release of all prior claims, and Holtham's representation that he had "the ability and resources to comply with" its obligations. According to a past financial statement, annexed to the parties' prenuptial agreement, Holtham was a multi-millionaire.

Holtham did not pay off the car loan or transfer title by July 9, 2017. The parties' attorneys exchanged letters in October 2017 about Holtham's non-performance. His attorney alleged that Holtham had met his obligations under the agreement and was prepared to transfer title, but asserted various offsetting claims exceeding $65,000. Lucas's counsel requested immediate transfer of title and payment of $150 for each day of non-compliance. He asserted the mutual release barred Holtham's claimed offsets and threatened to file a motion to enforce the MSA.

Holtham does not dispute that he waited until early November 2017 to pay off the remaining car loan balance. He delivered title on December 1, 2017 – a delay that he blamed on the lienholder – two weeks after Lucas filed a notice of motion for relief under the MSA.

Citing MetLife Capital Financial Corp. v. Washington Avenue Associates, L.P., 159 N.J. 484, 493 (1999), Holtham's counsel argued that the per diem charge did not constitute reasonable liquidated damages and was instead an unenforceable penalty. Lucas's counsel argued that Holtham was contractually bound by the MSA's penalty provision. After taking limited testimony from Holtham, the court enforced the penalty provision, ordering Holtham to pay $18,450 (which consisted of $150 for each day between July 9 and November 8), plus $6,013.50 in attorney's fees. The court noted that although Holtham had the ability to comply, he unjustifiably delayed by interposing offsetting claims he had already forfeited in the mutual release.

On appeal, Holtham renews his argument that the $150 daily charge is an unenforceable penalty.

## II.

The enforceability of a stipulated damages clause presents a legal issue. Wasserman's Inc. v. Middletown, 137 N.J. 238, 257 (1994). Therefore, we do not defer to the trial court and review the matter de novo. Manalapan Realty,

L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).  But, we review for abuse of discretion a family court's exercise of equitable authority to modify a property settlement agreement it finds "unjust, oppressive or inequitable."  Schwartzman v. Schwartzman, 248 N.J. Super. 73, 77 (App. Div. 1991).

A.

Courts scrutinize stipulated damages provisions for "reasonableness."  MetLife, 159 N.J. at 493.  If reasonable under the totality of the circumstances, courts will enforce such damages, labeling them "liquidated damages."  Id. at 493, 495.  If unreasonable, courts will deem such damages "penalties" and will not enforce them.  Id. at 493.  "The purpose of a stipulated damages clause is not to compel the promisor to perform, but to compensate the promisee for non-performance."  Wasserman's, 137 N.J. at 254.  In other words, liquidated damages are an "estimate in advance [of] the actual damage that will probably ensue from the breach," while a penalty is "a punishment, the threat of which is designed to prevent the breach."  Westmont Country Club v. Kameny, 82 N.J. Super. 200, 205 (App. Div. 1964).

The enforceability of stipulated damages turns primarily on two factors: the extent the stipulated amount is within a plausible range of actual damages, viewed from either the time of contracting or breach; and the difficulty of

6

calculating damages upon breach. MetLife, 159 N.J. at 493-95; see also

N.J.S.A. 12A:2-718(1) (applying these two perspectives to liquidated damages

for breach of a sales agreement).

Regarding the first factor, "[d]etermining enforceability at the time

either when the contract is made or when it is breached encourages more

frequent enforcement of stipulated damages clauses." Wasserman's, 137 N.J.

at 251-52.[2] Regarding the second factor, "[t]he greater the difficulty of

estimating or proving damages, the more likely the stipulated damages will

appear reasonable." Id. at 250 (quoting Wassenaar v. Panos, 331 N.W.2d 357,

363 (Wis. 1983)). "[T]he parties' characterization of stipulated damages as

'liquidated damages' or as a 'penalty' should not be dispositive." Wasserman's,

137 N.J. at 251. Since "considerations of judicial economy and freedom of

contract favor enforcement of stipulated damages clauses," a party challenging

such a clause bears the burden to show it is unreasonable. MetLife, 159 N.J. at

496, 504 (quoting Wassenaar, 331 N.W.2d at 362).

Under these principles, Holtham met his burden to demonstrate the $150

per diem charge is a penalty. The harm Lucas suffered from Holtham's delay,

---

[2]  In other words, if the stipulated damages clause is sustainable from one perspective but not the other, it survives. "Thus a court should look to the actual loss to sustain provisions that might otherwise be unenforceable, but not to strike down provisions that would otherwise be enforceable." 3 E. Allan Farnsworth, Farnsworth on Contracts § 12.18, at 310 (3d ed. 2004).

to the extent compensable as contract damages, fell short of $18,450. She retained full use of the Mercedes. While Holtham's delay prevented her from transferring the vehicle, the record provides no basis for approximating her loss at $18,450. The breach would also not require him to compensate Lucas for any emotional distress or irritation she experienced, even if Holtham purposely delayed performance and dredged up old claims to upset his ex-wife. See Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 364-65 (1988) (stating that contract breach generally provides no basis to recover for "mental suffering").

The clause fares no better from the parties' perspective at the time of contracting. The $150 per diem provision is akin to a "'shotgun' or 'blunderbuss' clause, one that fixes a single large sum for any breach, substantial or insubstantial." See 3 Farnsworth on Contracts § 12.18, at 310. For example, Holtham would be liable for the same charge whether he delayed paying Lucas $315,000 as required or delivering title to the car after satisfying the loan. We decline to consider the $150 per diem charge a reasonable prediction of damages when those damages could range from substantial to virtually non-existent.[3]

---

[3] Professor Farnsworth argued persuasively that a blunderbuss clause should be enforced "as long as it is a reasonable forecast in the light of the breach that (continued)

In sum, applying traditional contract principles, the $150 per diem charge would constitute an unenforceable penalty. However, that does not end our analysis. The policies underlying those contract principles do not apply with equal force in the divorce context. Rather, judicial enforcement of agreements to settle divorce actions implicates policy goals that justify relaxing the penalty rule, and instead subjecting a penalty to the family court's broad power to assure equity and prevent unconscionability.

### B.

The family court is not bound by the contract principles underlying the penalty rule. We recognize that "[a]n agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute." Quinn v. Quinn, 225 N.J. 34, 45 (2016). However, "[t]he interpretation, application, and enforceability of divorce agreements are not governed solely by contract law." Konzelman v. Konzelman, 158 N.J. 185, 194 (1999); see also ibid. (stating that "contract principles have little place in the law of domestic relations" (quoting Lepis v. Lepis, 83 N.J. 139, 148 (1980))).

---

(continued)

actually occurred." 3 Farnsworth on Contracts § 12.18, at 310-11. He contended that a non-complying party "should not be given the loophole of escape that, if he had committed a different breach, the sum named would not have been reasonable." Ibid. (quoting C. McCormick, Law of Damages § 151 (1935)). However, as we have observed, $150 was not "a reasonable forecast" of the ordinarily compensable damages from Holtham's actual breach.

"Divorce agreements are necessarily infused with equitable considerations and are construed in light of salient legal and policy concerns." Ibid. Therefore, "for equitable reasons normal tenets of contract interpretation are sometimes not applicable to matrimonial matters." Quinn, 225 N.J. at 46. "'[T]he law grants particular leniency to agreements made in the domestic arena' and vests 'judges greater discretion when interpreting such agreements.'" Id. at 45-46 (quoting Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)). That discretion allows a court, upon finding a change of circumstances, to modify a divorce agreement if continued enforcement would be "unfair, unjust, and inequitable." Konzelman, 158 N.J. at 194.

On the other hand, the court will not generally make a better agreement than the parties themselves made. Quinn, 225 N.J. at 45. Here, ironically, equitable principles warrant enforcement of the parties' agreement where normal contract principles – the penalty rule – would compel their non-enforcement.

It is worthwhile to review the purpose of contract damages and the rationale of the penalty rule. "[T]he law's goal on breach of contract is not to deter breach by compelling the promisor to perform, but rather to redress breach by compensating the promis[ ]ee." 3 Farnsworth on Contracts § 12.18, at 301. "Compensatory damages are designed 'to put the injured party in as

10

good a position as he would have had if performance had been rendered as promised.'" 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 (1961) (quoting 5 Corbin on Contracts § 992, at 5 (1951)). While "damages for breach of contract, by their nature, induce performance," liquidated damages are invalid when they coerce performance "by making breach unreasonably costly." 24 Williston on Contracts § 65:1 (4th ed. 2018).

Based on its historic roots, the penalty rule is said to protect against both oppression and excessive recovery – that is, recovery that far exceeds the economic losses normally recoverable for breach of contract. See Wasserman's, 137 N.J. at 248 (stating that "[d]isapproval of penalty clauses originated at early common law when debtors bound themselves through sealed penalty bonds for twice the amount of their actual debts"); Charles J. Goetz & Robert E. Scott, Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach, 77 Colum. L. Rev. 554, 556 (1977) (stating that one goal of the penalty rule is to protect against "unfair recovery in excess of justifiable reliance"). The penalty rule is said to assure so-called efficient breach, since penalties may encourage a promisor to perform when breach and compensation would be more beneficial to the promisor and, ostensibly, no less beneficial than performance to the promisee. Goetz & Scott, 77 Colum. L. Rev. at 556

(noting that the penalty rule is "envisioned as a protection against . . . the performance of a contract through fear of the penalty, where it would be more efficient economically to breach").

However, the penalty rule deprives a non-breaching party of adequate compensation for "idiosyncratic value," such as sentimental attachment, as opposed to "objective market valuation." Id. at 569-70. "[T]he [penalty] rule denies true compensation to the promisee with non-provable idiosyncratic wants, inducing him [or her] either to protect those wants with inefficient third party insurance or to suffer exposure to inefficient breaches." Id. at 594 (footnotes omitted).

The penalty rule's failure to account for non-market-based "idiosyncratic value" highlights a shortcoming of the rule in the matrimonial setting. The rule does not recognize the premium that the court and parties place on post-divorce peace. See Konzelman, 158 N.J. at 194 (noting that "[t]he very consensual and voluntary character of [marital settlement] agreements render them optimum solutions for abating marital discord . . . and assuring stability in post-divorce relationships"); Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443 (App. Div. 1978) (noting that "post-divorce peace is more conducive to the welfare of the parties"). The court favors enforcement of voluntary divorce agreements largely because they presumably represent the parties' best

effort to resolve often intensely personal and vexatious problems.  Konzelman, 158 N.J. at 193-94.

The penalty rule also does not account for the fact that parties to matrimonial agreements may behave far differently than the rational economic actors presumed to participate in typical contractual relationships.  A party to a MSA may decide to breach not to promote efficiency but to inflict some harm, emotional or economic, on the former spouse.  Consequently, a per diem fee that may fail as a penalty under traditional contract principles may reasonably deter or remedy the emotional harm caused by a breach of post-marital peace.

Existing judicial sanctions to deter breach of marital settlement agreements reflect a public policy that is receptive to penalty clauses designed to achieve the same end.  Under Rule 5:3-7, a court may economically sanction a party for violating an order on custody, parenting time, or spousal or child support.  Although the Rule does not address equitable distribution orders or judgments, the court may impose sanctions under Rule 1:10-3.  See Pressler & Verniero, Current N.J. Court Rules, cmt. 4.4.3 to R. 1:10-3 (2018) (addressing monetary relief).  Like penalties imposed under an MSA, such judicially crafted sanctions are not limited to actual damages, but they must be "rationally related to the desideratum of imposing a 'sting' on the offending party within its reasonable economic means."  Innes v. Carrascosa, 391 N.J.

Super. 453, 498 (App. Div. 2007) (affirming a per diem penalty for custody order violations (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 4.4.3 on R. 1:10-3 (2007))). The sting of a sanction, unlike the specter of contract damages, is designed to deter and coerce.

In sum, consistent with the policy favoring enforcement of divorcing parties' own resolution of their marital controversies, and the policy favoring sanctions to deter non-compliance with matrimonial orders, we decline to apply the penalty rule to matrimonial settlement agreements.[4]

Our view finds support in the decisions of other courts. In Dougan v. Dougan, 970 A.2d 131, 133 (Conn. App. Ct. 2009), aff'd on other grounds, 21 A.3d 791 (Conn. 2011), the Appellate Court of Connecticut declined to void as against public policy a provision that imposed ten-percent interest on an amount payable, to run from the date of a divorce settlement agreement instead

---

[4]  The Supreme Court suggested that different rules might apply to penalty provisions within consumer contracts. MetLife, 159 N.J. at 500 & n.2 (enforcing a fixed late charge in a loan contract "between sophisticated commercial entities" but declining to address such a provision in consumer contracts); Wasserman's, 137 N.J. at 253 (declining to "reach the issue of the enforceability of liquidated damage clauses in consumer contracts"); see also Nohe v. Roblyn Dev. Corp., 296 N.J. Super. 172, 177 (App. Div. 1997) (declining to enforce a liquidated damages clause in a consumer contract). However, an MSA is neither a commercial contract between sophisticated entities nor a consumer contract between a business and a consumer. Addressing the family-related concerns of former spouses, it may, as in this case, be the product of arm's length, counseled negotiations.

of the date the payment was due. The court noted that the promisor-husband was a sophisticated multi-millionaire, both parties received the help of counsel and participated in lengthy negotiations, and the provision was unambiguous. Id. at 138. The appellate court held that "the public policies in favor of enforcement [of the interest provision] outweigh the public policy against." Id. at 138 n.11. A concurring judge noted that family cases present special concerns that "may sometimes justify a departure from the rules that ordinarily apply to other civil disputes." Id. at 142 (Borden, J., concurring) (citation omitted). Enforcing the interest provision furthered the public policy supporting private settlement of estranged marital partners' financial affairs. Id. at 143 (citation omitted).

In Varner v. Varner, 666 So.2d 493 (Miss. 1995), the court upheld a divorce settlement provision imposing a "ten percent penalty" for late-paid child support and alimony. The court recognized that divorce decrees are "quasi-contracts," and when parties enter settlement agreements "there is more at work than general contract law." Id. at 496-97 (citation omitted). The reviewing court noted the chancellor had approved the parties' agreement, endowing it with the status of a court order. Id. at 497. In view of the

15

promisor's consistent failure to meet his financial obligation, the court found that the chancellor acted appropriately in enforcing the provision.  Ibid.[5]

Although we hold that the penalty rule does not apply to MSAs, we emphasize that the family court retains broad power to invalidate or reform a penalty provision in an MSA if it is unconscionable or the product of fraud, undue pressure, or coercion, or where one party lacks independent counsel. See Miller v. Miller, 160 N.J. 408, 418 (1999) (recognizing the court's power to reform an unconscionable divorce settlement agreement); Conforti v. Guliadis, 128 N.J. 318, 323 (1992) (noting the court's power to modify property distribution provisions of a divorce judgment); Glass v. Glass, 366 N.J. Super. 357, 371 (App. Div. 2004) (reviewing factors relevant to determining whether an agreement is fair and equitable); Massar v. Massar, 279 N.J. Super. 89, 93 (App. Div. 1995) (stating that "[m]arital agreements . . . are enforceable only if they are fair and equitable"); Peskin v. Peskin, 271 N.J. Super. 261, 276 (App. Div. 1994) (stating an MSA must be set aside if "achieved through coercion, deception, fraud, undue pressure, or unseemly conduct, or if one party was not competent"); Guglielmo v. Guglielmo, 253

---

[5]  We are unpersuaded by the view of other courts that have applied the penalty rule to divorce settlement agreements.  See Willner v. Willner, 538 N.Y.S.2d 599 (App. Div. 1989); Jessen v. Jessen, 810 P.2d 987 (Wyo. 1991).  Those courts did not recognize the special nature of divorce settlement agreements that justifies departing from traditional contract principles.

N.J. Super. 531, 542 (App. Div. 1992) (finding an agreement unconscionable where one party lacked adequate independent counsel).

A family judge should scrutinize a penalty provision in light of the totality of circumstances. Regarding negotiations preceding the provision's adoption, the court may look to the parties' relative bargaining power and sophistication, their understanding of the provision, and whether they were assisted by independent counsel. Regarding enforcement in a specific case, the court may consider the size of the penalty in light of the actual breach, and may reduce a penalty to assure it is proportionate to the violation and resulting harm, which may include emotional distress and disruption of post-divorce peace. While the court may also consider the breaching party's ability to pay, a lack of resources should not license a party to purposely shirk negotiated duties with impunity. Also relevant is the breaching party's good faith or whether he or she acted deliberately or without reasonable justification. In short, the family court, in exercising its broad authority, may reform a penalty provision to achieve fairness and equity.

In this case, the totality of the circumstances supports enforcement of the penalty provision. Plaintiff is a sophisticated businessman and, as of the parties' prenuptial agreement, a person of great wealth. He was represented by counsel in negotiating the MSA. We may presume that he understood the

17

nature of the penalty provision and was prepared to abide by it when he entered the agreement. While defendant did not suffer substantial financial harm, we recognize the significant impact of plaintiff's breach on post-divorce peace. The trial court found that plaintiff's breach was deliberate and lacking any reasoned justification, as plaintiff insisted upon offsets that he clearly waived in the mutual release provision of the MSA. Therefore, we discern no basis to disturb the trial court's order enforcing the penalty provision and requiring plaintiff to pay $18,450 to defendant.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION